**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WILLIAM A. PROCTOR, | No. CIV S-96-1401-DFL-CMK |
| Petitioner, | DEATH PENALTY CASE |
| vs. | <u>FINDINGS AND RECOMMENDATIONS</u> |
| ROBERT L. AYERS, JR., et al., | |
| Respondents. | |

_____/

Petitioner, a state prisoner proceeding with appointed counsel, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to court order, the parties have filed cross-motions for summary judgment (Docs. 176 and 189) addressing 20 guilt phase claims raised in the petition.[1] Petitioner has also filed a motion (Docs. 185 and 186) under Federal Rule

---

[1]    Through their cross-motions, the parties seek adjudications on the merits of petitioner's guilt-phase claims. The court, therefore, will treat the motions as merits briefs.
    The court also notes that respondents were directed to brief those guilt phase claims for which summary judgment would be appropriate. In their motion for summary judgment, respondents have not briefed Claims AA1, AA2, or AA3, which argue ineffective assistance of counsel at the guilt phase. Because these claims were not briefed, the court concludes that respondents have determined these claims are not appropriate for summary judgment. Additionally, as with penalty phase claims, petitioner's claims regarding the post-conviction process have not been briefed and are not presently before the court for decision.

1  of Civil Procedure 56(f).

2  In their cross-motion, respondents seek adjudications, as a matter of law, on

3  Claims A through T.  In his cross-motion, petitioner seeks adjudications on Claims C, D, F

4  through H, J, M through O, and Q through S.  As to Claim A, petitioner asserts through his Rule

5  56(f) motion that additional discovery is required in order to address this claim.

6  At the time respondents filed their cross-motion, findings and recommendations

7  had been issued recommending that a number of claims be dismissed.  Respondents filed their

8  cross-motion under the assumption that the findings and recommendations would be adopted in

9  full but requested the opportunity to brief the merits of any claims the court ultimately declined

10  to dismiss.  On March 30, 2005, the court issued an order adopting some, but not all, of the

11  findings and recommendations.  In particular, and relevant to the pending cross-motions, the

12  court dismissed Claims B, E, I, and T.  The court, however, declined to dismiss Claim L.  As to

13  Claim K, the court dismissed only that portion of the claim raising a causal connection argument.

14  The rest of the claim remains.  Pursuant to court order, the parties have submitted supplemental

15  briefing on Claim K, except to the extent such claim has been dismissed, and Claim L.

16

17  **I. BACKGROUND**

18  Petitioner was convicted of murder with special circumstances in 1982 and, after

19  a re-trial of the penalty phase, was sentenced to death in 1983.

20  A.    <u>**Facts**</u>[2]

21  The California Supreme Court recited the following summary of facts:

22  The evidence at trial established that on the evening of April 21, 1982,
   defendant entered the residence of Mrs. Bonita Stendal, a widow living
23  alone, and sometime that evening or early the next morning, raped,

24  _____

25  [2]    Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made
   by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this
   presumption.  <u>See id.</u>  These facts are, therefore, drawn from the state court's opinion(s), lodged
26  in this court.  Petitioner may also be referred to as "defendant."

tortured, and murdered her.  Defendant then transported her body in the trunk of her automobile to a site near a lake 12 miles away, where he pushed the body off an embankment.

People v. Proctor, 4 Cal.4th 499, 514 (1992).

On review of the California Supreme Court's decision in this case regarding constitutional vagueness claims, the United States Supreme Court summarized the facts as follows:

Petitioner Proctor murdered Bonnie Stendal, a 55-year-old schoolteacher who lived in Burney, a small community in Shasta County, California. On a night in April 1982, Proctor entered Mrs. Stendal's home and beat her, causing numerous cuts and bruises on her face. Proctor stabbed Mrs. Stendal in the neck several times and inflicted seven stab wounds in the area of the right breast. Proctor raped Mrs. Stendal and committed further sexual assaults with a foreign object. After beating, torturing, and raping Mrs. Stendal, Proctor strangled her to death and dumped her body on the side of the road near Lake Britton, 12 miles from Burney. The body was found late the next afternoon, clad in a nightgown with hands tied behind the back.

Tuilaepa v. California, 512 U.S. 967, 970-71 (1994).[3]

As to the cause of Mrs. Stendal's death, the California Supreme Court offered the following:

On April 24, Dr. Boyd Stephens of the San Francisco City and County Coroner's office performed an autopsy on the body.  He estimated that Mrs. Stendal had been killed sometime between the early evening hours of April 21 and the early morning hours of April 22.  She was not killed in the location at which her body was found but had been transported there after death.

In Dr. Stephens's opinion, Mrs. Stendal's death was caused by asphyxiation, initiated by nonfatal strangulation.  The face had suffered numerous cuts and bruises from a blunt force.  The eyes were swollen shut and the nose and lips also were swollen.  Dr. Stephens believed that most of these injuries resulted from seven to nine blows.  There were various internal injuries in the area of the neck.  There were a number of shallow stab wounds and incisions caused by dragging a weapon across the skin in the area of the neck.  The curvature of some of the injuries indicated they had been inflicted slowly and deliberately.  There were seven wounds less than two inches deep to the area of the right breast which had been inflicted while Mrs. Stendal still was alive but unable to move away from her assailant.  In Dr. Stephens's opinion, these wounds were inflicted for the purpose of causing pain or fear.

---

[3]    Petitioner's case was consolidated with Tuilaepa's case in the Supreme Court.

3

Prior to death, Mrs. Stendal had suffered four stretching injuries on the labia and a fifth injury which extended into the opening of the vagina. In the coroner's opinion, four of these probably were caused by a foreign object, and the fifth, probably by a penis. There was no semen inside or on the body.

Also while alive, Mrs. Stendal had received a blunt-force injury to the area of her right kidney. There also were blunt-force injuries to her left foot. The ligatures used to tie her hands were tied so tightly they had cut into her wrists. There were post mortem abrasion injuries attributed to dragging the body.

Proctor, 4 Cal.4th at 516-17.

Concerning petitioner's connection to the crime, the California Supreme Court stated:

In view of the circumstantial nature of the evidence connecting defendant to the commission of the crimes, and the nature of the defense that was presented at trial,[4] we consider it necessary to set forth in substantial detail the evidence relating to defendant's activities immediately preceding and following the commission of the murder.

Mrs. Stendal's son David (who was approximately 21 years of age at the time of trial) had lived with Mrs. Stendal until 1979, when he moved to Chico. David had known defendant (20 years of age at the time of trial) and Robert Manley (26 years of age at the time of trial) for several years and often had smoked marijuana with them. David had concealed marijuana in various locations within the Stendal residence until sometime in 1979 or 1980. Manley resided with his mother, Neta Manley, less than one block from the Stendal residence.

From February 18, 1981, to April 9, 1982, defendant was not present in the Burney area. In late January 1982, defendant commenced a four-week general truck-driving course at Western Truck School, where he received instruction in tying knots. Students at the school were taught to tie several types of trucker's knots, which knots were identical to those found on the ligatures used to bind Mrs. Stendal's wrists.

Approximately two weeks prior to the murder of Mrs. Stendal, defendant returned to live with his mother and two brothers in Burney. In the early morning hours of either Friday or Saturday, April 16 or 17, defendant and Robert Manley made four or five obscene or "crank" telephone calls from the Manley residence to various Burney residents. Robert Manley telephoned Mrs. Stendal and told her he would like to have sexual relations with her. Defendant made a separate obscene telephone call to an unnamed person.

---

[4]     Petitioner's theory of the case is that Robert Manley perpetrated the crimes against Mrs. Stendal.

4

On April 21, 1982, defendant hitchhiked to the Manley residence, arriving approximately 2 p.m. Mrs. Manley returned from work at 3 p.m. Prior to 5 p.m., Mrs. Manley drove defendant to a market in Burney to purchase liquor. When they returned to the Manley residence, the three had a drink and then ate dinner at 5 p.m. Approximately 5:30 p.m., defendant and Robert Manley walked to a local convenience store, where Manley purchased two packs of unfiltered Camel cigarettes (the brand and type they both smoked), giving one pack to defendant. They returned to the Manley residence to drink and watch a baseball game on television, and remained there after Mrs. Manley departed at 7 p.m. Defendant had three or four drinks. The baseball game commenced at approximately 7:35 p.m. Between 8 p.m. and 8:30 p.m., defendant telephoned his mother to report he was at the Manley residence and intended to remain there for the night.

Approximately 8:30 p.m. defendant departed, informing Robert Manley that he was going to one of the local bars to "pick up a woman" and would return later to spend the night. When he left, defendant was wearing thongs, white socks, blue jeans, a blue shirt, and a gold-colored windbreaker borrowed from Robert Manley, because defendant did not have his own jacket with him. Shortly after 8:30 p.m., defendant arrived at the residence of his friend Jeffrey Bohall, who lived five to six blocks from the Manley residence and four to five blocks from the Stendal residence. Defendant remained at that location until sometime before 10 p.m., when he departed in order to have a few drinks and "get a piece of butt." Defendant inquired whether Bohall wanted to accompany him but Bohall declined. Bohall's mother, Juanita Bohall, who was home during defendant's visit, testified that defendant was wearing blue jeans and an off-white or cream-colored lightweight jacket with a rust-brown trim. She could not clearly remember his shoes but thought they were lightweight.

When Mrs. Manley returned to her residence between 10:30 p.m. and 11 p.m. that evening, defendant was not present. When Robert Manley retired at 2:30 a.m. after watching the baseball game and a late-night movie, defendant still had not returned. When Mrs. Manley left for work between 5:30 and 6 a.m., defendant was not at the Manley residence. According to defendant's mother, Julia Proctor, the defendant did not return to the Proctor residence during the night of April 21.

After sunrise, at 5:30 a.m. on the morning of April 22, defendant's aunt, Sharon Palkki, observed defendant walking across the street in front of Palkki's residence, which was located approximately 500 feet from Mrs. Stendal's residence, several miles from defendant's residence in Johnson Park on the outskirts of Burney. Defendant was wearing loose-fitting blue jeans, white socks, and sandals, and what appeared to be a pair of gloves was dangling from his right pants pocket. Between 6 a.m. and 7 a.m., defendant telephoned his brother, Ed Proctor, instructing him to have their mother give defendant a ride home from the local market. Another witness observed defendant telephoning from that location during the same time period. When defendant's mother picked him up, defendant was wearing blue jeans and a gold-colored windbreaker, which she did not recognize. His mother did not remember the type of footwear defendant was wearing

5

but testified he owned a pair of thongs.

Approximately 11:30 a.m. on April 22, Robert Manley arose and telephoned defendant, who informed Manley that defendant had seen his (defendant's) mother downtown the previous evening and had driven home with her. When Robert Manley asked defendant whether he had watched the baseball game, the late-night movie, or any other television program at home, defendant responded he had not, and stated he was tired and wanted to sleep. Defendant agreed to meet Robert Manley after doing defendant's laundry. Later that day, Robert Manley and his mother drove to the Proctor residence, where they picked up defendant. They proceeded to Redding in order to purchase tickets to a concert. Defendant returned Robert Manley's jacket at that time, and Manley observed it was cleaner than it had been when he had given it to defendant the previous evening. After being dropped off and obtaining the tickets, Robert Manley and defendant met two women and spent the night with them at a motel in Redding.

On the morning of April 23, Shasta County officers brought defendant and Robert Manley to the sheriff's station for questioning. Defendant told Sergeant Jarrett that he had been at Robert Manley's residence until 8:30 p.m. on April 21 and then had gone into Burney. Defendant stated he had received a ride home that evening from an unidentified man in a pickup truck. At his residence, defendant had sharpened some knives for his mother, and had been home several hours before retiring at 11 p.m. Defendant did not arise until 9 a.m. on April 22, and did not leave the residence until after 3 p.m., when he went to Redding with Robert Manley and spent the night at a motel. Defendant showed Jarrett a motel room receipt, which defendant volunteered he had kept for an alibi in case anything flared up. Defendant denied having visited Mrs. Stendal's residence.

Defendant was placed in custody for a parole violation he admitted to the officers. One of the officers observed that defendant had suffered abrasions below each knee, and that there were what appeared to be five or six somewhat parallel scratch marks above defendant's right knee. On April 24, Dr. Stephens examined defendant's leg injuries and determined they probably were two days old, and had not been sustained through any layers of clothing but rather while defendant's legs were uncovered. The injuries were similar to injuries Dr. Stephens had observed in other sexual assault cases.

On May 1, Mrs. Proctor visited defendant in custody and afterward informed one of the detectives that her son had asked her to tell Sergeant Jarrett that he had been at home on the night of the murder. When Mrs. Proctor had advised defendant she already had told Jarrett otherwise, defendant asked her to tell Jarrett that defendant had been at a party that evening.

The bloody palm print obtained from one pamphlet proved to match defendant's palm print, and the other, latent palm prints obtained from the booklets also matched defendant's palm prints. A very faint print from footwear was found at the location where the body was discovered and proved to be similar in design to the tread of a pair of thongs recovered

from defendant's possession. On May 2, defendant was placed under arrest for the murder of Mrs. Stendal.

Id. at 517-20.

The following time line summarizes the facts concerning petitioner's activities from April 21, 1982, to May 1, 1982.

April 21

| | |
|---|---|
| 8:00 – 8:30 p.m. | Petitioner telephoned his mother on the evening of the murder to tell her that he was at the Manley residence and intended to stay there for the night. |
| 8:30 p.m. | Petitioner told Manley that we was going out to a local bar to "pick up a woman" but would return to spend the night; before he left, he borrowed a gold-colored wind breaker from Manley. |
| 8:30 – 10:00 p.m. | Petitioner was at the residence of his friend, Jeffrey Bohall, who lived four to five blocks from the Stendal residence. |
| 10:00 p.m. | Petitioner left the Bohall residence in order to have a few drinks and "get a piece of butt"; Bohall declined to go with petitioner; Mrs. Bohall, who was home at the time, testified that petitioner was wearing a gold-colored jacket when he left. |
| 10:30 – 11:00 p.m. | Mrs. Manley returned home; petitioner was not present but Robert Manley was at home. |

April 22

| | |
|---|---|
| 2:30 a.m. | Manley retired after watching television; petitioner still had not returned to the Manley residence as he had said he would. |
| 5:30 – 6:00 a.m. | When Mrs. Manley left for work, petitioner was not at the Manley residence. |
| 5:30 a.m. | Petitioner was seen by his aunt 500 feet from the Stendal residence. |
| 6:00 – 7:00 a.m. | Petitioner was seen making a telephone call from a public location outside a market; petitioner called his brother in order to get a ride home; when petitioner's mother arrived to pick him up, petitioner was wearing a gold-colored jacket she did not recognize. |

| 11:30 a.m. | Petitioner called Manley on the telephone and told Manley that he had seen his mother (Mrs. Proctor) downtown the prior evening and had gone home with her; Manley testified at trial that when petitioner returned his jacket, Manley observed that it was cleaner than when he had given it to petitioner. |
|---|---|

April 23

Petitioner was brought to the sheriff's station for questioning, where he told the police that he had received a ride home from an unidentified man on the evening of April 21.  Petitioner also stated that he was home the entire evening and retired at 11:00 p.m. after sharpening some knives for his mother.  He denied having been in the Stendal residence.

April 24

Petitioner's leg abrasions were examined by the coroner, who testified at trial that they were caused when petitioner's legs were bare, were probably two days old, and were consistent with sexual assault cases.

May 1

After learning that his mother had already told the police that he was not home the night of the murder, petitioner asked his mother to say that he had been at a party that evening.  Petitioner's mother, with whom petitioner lived, testified at trial that petitioner did not return to the Proctor residence during the night of April 21-22.

Petitioner was found guilty of first degree murder,[5] forcible rape, and first degree burglary.  See id. at 514.  The jury also found true each of the three special circumstance allegations.  Specifically, the jury found that petitioner committed the murder: (1) in the course of rape; (2) in the course of burglary; and (3) with the infliction of torture.  See id.

**B.**      **Post-Conviction Procedural History**

In June 1997, petitioner filed his automatic direct appeal with the California Supreme Court.  Briefing was complete on March 14, 1988. On April 21, 1992, the California Supreme Court directed the parties to update their briefing.  Supplemental briefs were filed in June and July 1992.  On December 28, 1992, the California Supreme Court issued an opinion

---

[5]      The jury was presented with four alternate factual bases for first degree murder: (1) premeditation and deliberation; (2) felony murder based on burglary; (3) felony murder based on rape; and (4) torture murder.

1   affirming the conviction and sentence.  See Proctor, 4 Cal.4th 499.  The United States Supreme

2   Court granted certiorari and issued a decision affirming the California Supreme Court's decision

3   on June 30, 1994.  See Tuilaepa, 512 U.S. 967.

4              On November 22, 1994, petitioner filed a habeas petition in state court.  Petitioner

5   raised the following claims:

6   | Claim I | Financial pressures in Shasta County deprived petitioner of a fair trial; |

7

8   | Claim II | Petitioner was entitled to, but did not receive, effective representation of counsel; |

9   | Claim IV | Inadequate jury instructions on penalty factors permitted the prosecutor to argue contrary to California law; and |

10

11  | Claim V | The California death penalty scheme is unconstitutionally overbroad because it does not make a meaningful distinction between cases in which the death penalty is and is not imposed. |

12

13  In denying this petition on June 26, 1996, the California Supreme Court stated:

14              Petition for writ of habeas corpus DENIED.
            The claims . . . set forth as I and II are denied on the merits.
15          The petition does not include a claim set forth as III.
            The claim set forth as IV is denied on the procedural ground of
16          waiver, in that it could have been, but was not, raised on appeal
            from the judgment.  (In re Harris (1993) 5 Cal.4th 813, 829; In re
17          Dixon (1959) 41 Cal.2d 756, 759).  To the extent that claim IV
            raises a claim of prosecutorial misconduct, it is denied as an issue
18          that was raised in the appeal from the judgment.  (In re Harris,
            supra, 5 Cal.4th 813, 829; In re Waltreus (1965) 62 al.2d 218).
19          The claim set forth as V is denied on the merits.  (citation omitted).

20  Justices Mosk and Kennard were of the opinion that an order to show cause should issue.

21              Petitioner filed a second habeas petition in the California Supreme Court on

22  August 12, 1997.  In that petition, petitioner raised the following claims:

23  | Claim A | Petitioner's jury was unfairly skewed towards a guilty verdict by the death qualification of the jury and by the removal of prospective jurors for cause due to their views on the death penalty; |

24

25

26  | Claim B | Ineffective assistance of counsel at the guilt phase; |

| | | |
|---|---|---|
| Claim C | The penalty phase petit jury venire in Sacramento County did not represent a fair cross-section of the community; |
| Claim D | Improper denial of defense juror challenges for cause; |
| Claim E | The trial court improperly denied petitioner's Batson/Wheeler motion; |
| Claim F | Introduction of numerous irrelevant and unduly prejudicial photographs at the penalty phase violated petitioner's right to due process; |
| Claim G | Ineffective assistance of counsel at the penalty phase; |
| Claim H | The trial court committed prejudicial error in considering matters not before the jury when conducting its mandatory constitutional reappraisal of the death verdict; |
| Claim I | The cumulative effect of the errors on the issues of guilt, special circumstances, and penalty warrant reversal; |
| Claim J | Execution after prolonged confinement under sentence of death; |
| Claim K | Execution by lethal injection constitutes cruel and unusual punishment; |
| Claim L | Ineffective assistance of appellate counsel; |
| Claim M | Ineffective assistance of state post-conviction counsel; |
| Claim O | The California Supreme Court denied petitioner fair consideration of his habeas corpus petition; and |
| Claim P | Petitioner's death sentence violates international law. |

Petitioner did not raise any claim designated as Claim N.  The California Supreme Court denied

petitioner's second habeas petition, stating:

> The petition for writ of habeas corpus, filed August 12 1997, is denied.
> All claims are denied on the merits.
> All claims except claim I . . . , claim J . . . , claim O . . . , and claim P . . . also are denied as untimely.  (In re Robbins (1998) 18 Cal.4th 770, 784-815; In re Clark (1993) 5 Cal.4th 750, 782-787, 797-798).  All claims except claim I, claim J, claim K, claim M . . . , and claim O are denied as successive, because they could have been, but were not, raised in the first petition for writ of habeas corpus.  (In re Robbins, supra, 18 Cal.4th at p. 788, fn. 9; In re Clark, supra, 5 Cal.4th at pp. 767-768).

1    Claims A . . . , C . . . , D . . . , E . . . ., F . . . ., H . . ., and P . . . are
     denied because they should have been, but were not, raised on appeal.  (In
2    re Dixon (1953) 41 Cal.2d 756, 759).
         Brown, J., would deny the petition solely on the merits.
3        Petitioner's request to take judicial notice of the petition for writ of
     habeas corpus and Exhibit Numbers 11 through 34 filed by petitioner in In
4    re Fierro (S057031) is denied.

5

6                              **II.  STANDARDS OF REVIEW**

7         Because this action was filed after April 26, 1996, the provisions of the

8    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

9    applicable.[6]  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

10   (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA

11   does not, however, apply in all circumstances.  When it is clear that a state court has not reached

12   the merits of a petitioner's claim, because it was not raised in state court or because the court

13   denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

14   habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

15   2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to

16   reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204,

17   1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

18   perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

19   evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

20   petition de novo where state court had issued a ruling on the merits of a related claim, but not the

21   claim alleged by petitioner).  When the state court does not reach the merits of a claim,

22   "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

23

24        [6]    Petitioner argues that the deferential standards of review under AEDPA should
     not apply in this case because, had the state court resolved his case sooner, he would have been
25   able to file his federal petition prior to AEDPA's effective date.  The court notes that petitioner
     has already raised this argument and that it was rejected in the court's May 23, 1997, order,
26   reconsideration of which was denied on June 5, 1998.  The court declines to re-visit this issue.

1   Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

2   not available for any claim decided on the merits in state court proceedings unless the state

3   court's adjudication of the claim:

4   (1) resulted in a decision that was contrary to, or involved an
    unreasonable application of, clearly established Federal law, as
5   determined by the Supreme Court of the United States; or

6   (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the State
7   court proceeding.

8   28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

9   Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

10   Under § 2254(d), federal habeas relief is available where the state court's decision

11   is "contrary to" or represents an "unreasonable application of" clearly established law.  In

12   Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the

13   Court), the United States Supreme Court explained these different standards.  A state court

14   decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the

15   Supreme Court on the same question of law, or if the state court decides the case differently than

16   the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

17   court decision is also "contrary to" established law if it applies a rule which contradicts the

18   governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

19   that Supreme Court precedent requires a contrary outcome because the state court applied the

20   wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

21   Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

22   id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

23   determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040,

24   1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

25   case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

26   is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

1    State court decisions are reviewed under the far more deferential "unreasonable

2  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

3  unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

4  123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

5  suggested that federal habeas relief may be available under this standard where the state court

6  either unreasonably extends a legal principle to a new context where it should not apply, or

7  unreasonably refuses to extend that principle to a new context where it should apply.  See

8  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

9  decision is not an "unreasonable application of" controlling law simply because it is an

10  erroneous or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade,

11  123 S.Ct. 1166, 1175 (2003).  An "unreasonable application of" controlling law cannot

12  necessarily be found even where the federal habeas court concludes that the state court decision

13  is clearly erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear

14  error fails to give proper deference to state courts by conflating error (even clear error) with

15  unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal

16  law, where a state court decision is an "unreasonable application of" controlling law, federal

17  habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn,

18  283 F.3d at 1052 n.6.

19    The "unreasonable application of" standard also applies where the state court

20  denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

21  848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

22  are considered adjudications on the merits and are, therefore, entitled to deference under the

23  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

24  The federal habeas court assumes that state court applied the correct law and analyzes whether

25  the state court's summary denial was based on an objectively unreasonable application of that

26  law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

# III.  DISCUSSION

The court will address petitioner's claims in the general order the issues arose at trial.  In Claim H, petitioner challenges where the trial was held, asserting that the denial of his motions for change of venue denied him a fair trial because of prejudicial pretrial publicity.  In Claim A, petitioner challenges the death qualification jury selection process.  In Claims C, D, F, H, and G, petitioner challenges various comments the trial court made to the jury.  As to the evidence adduced at trial, in Claims J, K, L, M, N, O, S, and Q, petitioner argues that the evidence was insufficient to establish various findings.  Next, in Claim R, petitioner challenges the trial court's jury instruction on the torture special circumstance.  Finally, in Claim P, petitioner argues that "financial and political pressures" in Shasta County denied him a fair trial.

## A.    **Change of Venue (Claim H)**

Petitioner claims that the trial court denied him a fair trial by denying his motions for change of venue because extensive press coverage impacted the pool of potential jurors.  In his motion for summary judgment, petitioner elaborates on this claim as follows:

> . . . Because of the extensive and prejudicial pretrial publicity, it was not possible to select an unbiased jury in Mr. Proctor's case, and the jury that sat at Mr. Proctor's trial was actually biased.  Accordingly, Mr. Proctor i[s] entitled to judgment as a matter of law on Claim H.  [¶]  The Sixth Amendment guarantees the right to be tried by a "panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961); Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 551 (1976).  The trial court may be unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere, or both.  In such a case, due process requires that the trial court grant defendant's motion for a change of venue.  Sheppard v. Maxwell, 384 U.S. 333, 360-61 (1966); Daniels v. Woodford, 428 F.3d 1181 (9th Cir. 2005).
>
> * * *
>
> In determining whether a change of venue motion should have been granted, the reviewing court must consider whether the publicity was sufficiently pervasive so as to apply a presumption of prejudice, or, if not, whether the defendant suffered "actual" prejudice from the denial of the motion.  Harris v. Pulley, 885 F.2d 1354, 1360 (9th Cir. 1988).  To demonstrate actual prejudice, Mr. Proctor must show actual partiality or hostility that could not be laid aside.  Id. at 1363.  Prejudice may be presumed, however, "when the record demonstrates that the community

14

1   where the trial was held was saturated with prejudicial and inflammatory
    media publicity about the crime." Ainsworth v. Calderon, 138 F.3d 787,
2   795, as amended, 152 F.3d 1223 (9th Cir. 1998).

3   In their motion for summary judgment, respondents argue:

4           . . . To prevail on Claim H, Petitioner must show that the state
        court was objectively unreasonable for not finding that prejudicial pretrial
5       publicity made it impossible to seat an impartial jury. Murphy v. Florida,
        421 U.S. 794, 799-803 (1975); Harris v. Pulley, 885 F.2d 1354, 1360 (9th
6       Cir. 1988).

7   Respondents next outline the facts concerning petitioner's motions for change of venue, as set

8   out in the California Supreme Court's opinion on direct review and conclude:

9           In light of the undisputed facts surrounding the motions to change
        venue, Claim H is amenable to summary adjudication. The most that the
10      record discloses is that some of the jurors were familiar with the facts or
        issues involved in the case. But mere familiarity with the facts and issues
11      does not indicate a change of venue is appropriate.. . . [. . .Irvin v. Dowd,
        366 U.S. 717, 722-23 (1961)]. None of the jurors in Petitioner's case had
12      formed an opinion as to the guilt or innocence of Petitioner and there has
        been no showing that a substantial percentage of persons in the venire who
13      were not seated had formed fixed opinions on the question of guilt.
        Further, the impact of pre-trial publicity was mitigated due to the lapse of
14      nearly three months between the issuance of the last report (8/17/82) and
        the commencement of jury selection (11/10/82). Proctor, 4 Cal.4th at 525;
15      accord Stroble v. California, 343 U.S. 181, 195 (1952) (finding no due
        process violation from widespread reports of defendant's confession
16      where publicity receded six weeks before trial). On these facts it cannot
        be said that the California Supreme Court's rejection of Claim H was
17      contrary to or an unreasonable application of Supreme Court precedent.

18          Before continuing, it is necessary to address the standard of review applicable to

19  this claim. Petitioner states in his motion for summary judgment that this court must conduct a

20  de novo review to determine whether he is entitled to relief on this claim because ". . . the

21  California Supreme Court either failed to adjudicate the merits of Mr. Proctor's constitutional

22  claims, did so in a manner contrary to clearly established federal law, or unreasonably applied

23  that law to the facts of Mr. Proctor's case. . . ." and concludes that ". . . the limits on relief

24  established in [AEDPA] do not apply here. . . ."[7]  Elsewhere in his briefing, however, petitioner

25  _____

26      [7]     This argument is boilerplate as petitioner asserts it to almost all of his claims.

1    seems to indicate that AEDPA applies to this claim by arguing that the state court's decision was

2    "objectively unreasonable."  He also suggests that some other standard should apply because the

3    state applied only state law and ignored the factors required to be considered under federal law.

4    It could be that petitioner is asserting that the state court applied the wrong law and, therefore,

5    the "contrary to" standard of review applies.  Or, he could be asserting that, by considering only

6    state law, the state court did not adjudicate his constitutional claim on the merits, in which case

7    review would be de novo.

8            Setting this confusion aside, petitioner argues that the correct legal test involves

9    consideration of the following factors: (1) whether actual partiality or hostility existed among

10   jury members that could not be laid aside; (2) whether the community where the trial was held

11   was saturated with prejudicial and inflammatory media publicity about the crime "amounting to

12   a wave of public passion"; (3) whether news accounts were primarily factual; and (4) whether

13   media accounts contained inflammatory material not admissible at trial.  The court agrees that

14   this is an accurate expression of clearly established law.[8]

15           A review of the California Supreme Court's opinion reveals that it considered the

16   following facts, which this court must presume to be true because petitioner has not challenged

17   them with clear and convincing evidence to the contrary:

18           1.    The seriousness of the charges against petitioner;

19           2.    The nature of the acts committed upon the victim;

20           3.    The nature and extent of pretrial publicity, particularly:

21                 a.    Copies of six newspaper articles in the Inter-Mountain News, and
22                       approximately 20 in the Redding Record Searchlight, between
                         April 1982 and August 1982; and

23                 b.    More than 60 "copy-notes" from local television and radio stations
                         between the same times;

24

25   ─────────────────

26   [8]      As discussed in more detailed below, the first factor listed by petitioner relates to
     actual prejudice.  The remaining factors relate to presumed prejudice.

16

4.      The results of a telephone public-opinion survey conducted between September 21, and 22, 1982, revealing that, of the 169 persons contacted, 80% had heard of the case, 55% had heard of an arrest having been made, and 31% had formed an opinion as to defendant's guilt;

5.      The lapse of nearly three months between the issuance of the last news report on August 17, 1982, and the commencement of jury selection on November 10, 1982;

6.      The trial was held in Redding, a larger community and not the locus of the crime, which was committed in Burney, 35 miles away;

7.      The size of community;

8.      The respective prominence of the defendant and the victim – Mrs. Stendal was well-liked and well-known in Burney and was described as having "taught everyone's kids"; defendant was also a long-time Burney resident who had not earned any notoriety; and

9.      All but three of the jurors had learned something about the case from news reporting.

See Proctor, 4 Cal.4th at 524-27.

As to the news reports, the state court observed: "Many of these news reports detailed the conditions in which Mrs. Stendal's body was found and the circumstances of her death; several included the circumstance that defendant's palm print had been found at the murder scene, and several reported that the prosecutor intended to seek the death penalty because of the heinous nature of the crime." Id.  As to the press exposure on the actual jurors in petitioner's case, the state court noted:

. . . Our review of the record reveals, however, that most of those jurors [who had heard of the case through news reporting] had received only minimal pretrial exposure to the case, that such exposure took place during a period well before commencement of the trial, that the jurors had not been informed of the evidence linking defendant to the case but only that the murder had occurred, and that when questioned on the subject, all of these jurors attested to their ability to put aside everything they had learned about the case and to decide the issues based solely on the evidence presented at trial.

Id. at 527.

///

///

17

The state court next considered whether petitioner was prejudiced by the denial of his change of venue motions:

> . . . It appears that, although he established the possibility of an unfair trial in [Redding], defendant failed to carry his burden of proving there was a reasonable likelihood that jurors drawn from Shasta County would have formed such fixed opinions as a result of the pretrial publicity that they could not make the required determinations with impartiality.
>
> Considering the relative closeness of the issue, however, we turn next to the question whether any error in the trial court's ruling – that defendant did not carry the burden – would be prejudicial, that is, whether the record demonstrates a reasonable likelihood he did not in fact receive a fair trial. With this purpose in mind, we consider the jury voir dire surrounding the case, bearing in mind that no presumption of a deprivation of due process of law arises from juror exposure to publicity concerning the case. (citation omitted).
>
> * * *
>
> Having considered the totality of the evidence, we conclude defendant has not met his burden on appeal of demonstrating both that it was reasonably likely he could not receive a fair trial in Shasta County absent a change of venue, and that it was reasonably likely he did not in fact receive a fair trial. Therefore, reversal is not required.
>
> Id. at 526-28.

According to the 1961 Supreme Court case Irvin v. Dowd – cited by both parties – the general rule is that "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence." Irvin, 366 U.S. at 723. This rule, however, does not foreclose the possibility that, in a particular case, "the nature and strength of the opinion formed . . . raise the presumption of partiality." Id. The petitioner must show the actual existence of such an opinion. See id. After reciting the publicity concerning Irvin's case, the Court stated:

> It cannot be gainsaid that the force of this continued adverse publicity caused a sustained excitement and fostered a strong prejudice among the people of Gibson County. In fact, on the second day devoted to the selection of the jury, the newspapers reported that "strong feelings, often bitter and angry, rumbled to the surface," and that "the extent to which the multiple murders – three in one family – have aroused feelings throughout the area was emphasized Friday when 27 of the 35 prospective jurors questioned were excused for holding biased pretrial opinions . . . ." A few days later the feeling was described as "a pattern of deep and bitter

18

prejudice against the former pipe-fitter." Spectator comments, as printed by the newspapers, were "my mind is made up"; "I think he is guilty"; and "he should be hanged."

Finally, and with remarkable understatement, the headlines reported that "impartial jurors are hard to find." The panel consisted of 430 persons. The court itself excused 268 of those on challenges for cause as having fixed opinions as to the guilt of petitioner; 103 were excused because of conscientious objection to the imposition of the death penalty; 20, the maximum allowed, were peremptorily challenged by petitioner and 10 by the State. . . . An examination of the 2,783-page voir dire record shows that 370 prospective jurors or almost 90% of those examined on the point . . . entertained some opinion as to guilt – ranging in intensity from mere suspicion to absolute certainty. A number admitted that, if they were in the accused's place in the dock and he in theirs on the jury with their opinions, they would not want him on a jury.

Id. at 726-27.

As to actual bias of the jurors seated, the Court noted that "[e]ight out of the 12 thought petitioner was guilty." Id. at 727. On these facts, the Court concluded that habeas relief was warranted because petitioner had been denied an impartial jury. See id. at 728.

In Ainsworth v. Calderon, the Ninth Circuit framed the rule as follows:

A defendant need only demonstrate one of two different types of prejudice in support of a motion to transfer venue: presumed or actual. Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. Prejudice is rarely presumed because "saturation" defines conditions found only in extreme situations. To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside.

138 F.3d at 795.

The court concluded that, because media reporting was factual and had waned for several months prior to jury selection, presumed prejudice did not exist. See id. (citing Harris v. Pulley, 885 F.2d 1254, 1362 (9th Cir. 1988), and Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 554 (1976)). In also concluding that actual prejudice had not been shown, the court noted that only eight of the 95 prospective jurors questioned had formed an opinion (three from sources other than the media, and five from media reporting). See id. at 796.

1          In Daniels v. Woodford, the Ninth Circuit outlined the factors to be considered in

2  determining presumed prejudice.  See 428 F.3d at 1211.  As petitioner states, the factors are:

3  (1) whether there was a barrage of inflammatory publicity immediately prior to trial, amounting

4  to a huge wave of public passion; (2) whether the news accounts were primarily factual because

5  such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media

6  accounts contained inflammatory or prejudicial material not admissible at trial.  See id. (citing

7  Ainsworth, 138 F.3d at 795).  Based on the facts as outlined in the state court's decision, the

8  Ninth Circuit concluded that "the public's response to [the] publicity clearly amounted to a

9  'huge' wave of public passion."  Id.

10          Comparing the foregoing discussion of the clearly established tests for presumed

11  and actual prejudice with the California Supreme Court's discussion in petitioner's case, this

12  court concludes that the state court applied the correct law.  It appears that petitioner's assertion

13  that the California Supreme Court did not address his claim is derived from the state court's

14  reliance on state law to analyze the change of venue claim.  Where, however, the state court

15  applies the functional equivalent of the federal standard, the state court has applied the correct

16  law in adjudicating the constitutional claim.  See Early v. Packer, 537 U.S. 3, 7 (2002) (per

17  curiam).  In this case, based on the facts discussed in its opinion, it is clear that the California

18  Supreme Court considered the factors relevant under the federal standard to both presumed and

19  actual prejudice.  See Proctor, 4 Cal.4th at 523-28.  Therefore, this court must review the state

20  court's determination under the deferential "unreasonable application of" standard.

21          Turning now to the parties' arguments, this court may rely on the facts as recited

22  by the California Supreme Court.  See Daniels, 428 F.3d at 1211.  As to presumed prejudice, the

23  state court noted that there was a lapse of nearly three months between the issuance of the last

24  news report in August 1982, and the commencement of jury selection in November.

25  See Proctor, 4 Cal.4th at 525.  The state court also noted that the pretrial reporting had been

26  primarily factual in nature – an arrest had been made, the prosecutor was going to seek the death

penalty, and a palm print had been found at the scene.  See id. at 524-25.  In stating that these factors do not "strongly weigh in favor of or against a change of venue," the state court necessarily concluded that there was not a huge wave of public passion about the case, such as would establish presumed prejudice.  See id. at 526; see also Daniels, 428 F.3d at 1211.  Under Ainsworth and Daniels, this court concludes that the facts as recited by the California Supreme Court cannot lead to any other conclusion.  Therefore, the state court's determination that there was no presumed prejudice is not based on an unreasonable application of clearly established law.

In considering actual prejudice, the California Supreme Court noted that, while all but three of the jurors had learned something about the case from news reporting, "most of those jurors had received only minimal pretrial exposure to the case. . . ."  See Proctor, 4 Cal.4th at 527.  Unlike Irvin, where eight of the 12 jurors had formed the opinion prior to trial that the petitioner was guilty, there is no evidence that the jurors in this case formed such stark pretrial opinions.  Certainly, minimal pretrial exposure could not lead to such opinions.  Moreover, in contrast to Irvin and Ainsworth, there is also no evidence concerning the actual attitudes of the prospective jurors in this case.  The nearest evidence petitioner offered was the phone survey.  However, the court finds that this is more relevant to the question of presumed prejudice based on the general attitude in the community than it is to the question of actual prejudice on the part of the jurors seated in petitioner's trial.  Finally, the state court noted that all the jurors attested that they could lay aside whatever they had heard about the case and be impartial.  Because there is no evidence to establish that either the prospective jurors or seated jurors formed a prejudicial opinion, or that they could not lay any bias aside and carry out their duty, this court cannot say that the state court's determination is unreasonable application of the clearly established actual prejudice test.

/ / /

/ / /

1    For these reasons, respondents' motion for summary judgment on this claim

2 should be granted and petitioner's motion for summary judgment on this claim should be denied.

3 Claim H should be denied on the merits.[9]

4    **B.    Death Qualification (Claim A)**

5    Petitioner argues:

6    Petitioner's conviction, confinement, and death sentence are illegal
    in that the death qualification of the jury and the removal of prospective
7    jurors because of their views regarding the death penalty produced a jury
    unfairly skewed towards a guilty verdict. . . . [¶] The process of
8    questioning prospective jurors regarding their views concerning the death
    penalty and the removal of prospective jurors based on such views
9    deprived petitioner of his federal constitutional rights to both a jury
    selected from a fair cross-section of the community and a reliable
10    determination of whether death is an appropriate penalty.

11 In the amended petition, petitioner recognizes that the United States Supreme Court's decisions

12 in Lockhart v. McCree, 476 U.S. 162 (1986), and Buchanan v. Kentucky, 483 U.S. 402 (1987),

13 seem to foreclose his argument as a matter of law.  Petitioner argues, however, that "empirical

14 evidence continues to show that the exclusion from juries of persons with strong opposition to

15 capital punishment leaves a non-representative jury with a significant pro-prosecution bias,

16 actually resulting in verdicts against the defendant."  Petitioner concludes that, because of this

17 "overwhelming evidence," the facts which supported the decision in Lockhart have been

18 undermined, rendering the decision invalid today.  Because the state court denied this claim on

19 the merits but did not provide any reasoning, this court applies the "unreasonable application of"

20 standard to review the state court's determination of this claim.[10]  See Himes, 336 F.3d at 853;

21

22    [9]    The court observes that, because the California Supreme Court reached the
correct conclusion based on clearly established federal law, this result would be the same even if
23 the court applied the "contrary to" or de novo standards of review.

24    [10]    Petitioner repeats his boilerplate argument that "[t]he California Supreme Court
did not address Mr. Proctor's constitutional arguments and thus they were not adjudicated by the
25 state court."  This is incorrect.  Petitioner raised this claim as Claim A in his second state habeas
petition and argued the constitutional issue, citing as he does here, to Lockhart.  In addressing
26 the claim, the California Supreme Court denied the claim both on the merits and for various

1   Delgado, 233 F.3d at 982.  Under this standard, the court will assume that the California

2   Supreme Court applied the correct law and review to determine whether the state court's denial

3   of this claim was based on an objectively unreasonable application of that law.  See id.

4           Not surprisingly, respondents argue in their motion for summary judgment that

5   Claim A "must be rejected as a matter of law" in light of Lockhart and Buchanan.  In response,

6   petitioner has filed a motion pursuant to Federal Rule of Civil Procedure 56(f) ". . . to obtain

7   affidavits or other evidence necessary to oppose respondent's motion for summary judgment as

8   to Claim A."  Specifically, petitioner argues:

> To defeat respondent's motion for summary judgment on Claim A,
> petitioner must be allowed to establish that the "constitutional facts"
> underlying the Supreme Court's holding in [Lockhart] have changed.
> See e.g. United States v. Carolene Products, 304 U.S. 144, 153 (1938)
> (where a finding of constitutionality is predicated upon the existence of a
> particular set of facts beyond the sphere of judicial notice, that finding
> may be challenged by showing to the court that those facts no longer
> exist).  Expert testimony or declarations are required to make this
> showing.[11]

14  In support of this argument, petitioner states that studies have been conducted regarding the

15  impact of the death qualification process since Lockhart was decided.  Petitioner cites to nine

16  law review articles which "document the existence of, and analyze, those studies. . . ."  Petitioner

17  asserts that the studies ". . . overcome the factual problems identified in the Supreme Court in

18  [Lockhart].  The studies, conducted within the past 20 years, and on actual jurors, demonstrate

19  that death qualification jury selection does in fact result in biased juries that do not represent a

20  fair cross-section of the community."  Petitioner intends to obtain expert testimony from the

21  authors of the studies.

23  procedural defaults, including failure to raise the claim in petitioner's automatic direct appeal.

24      [11]     The court observes that the holding in Carolene Product is narrower than
    petitioner asserts.  There, the Court considered the facts underlying a statute which was under
25  constitutional challenge and concluded that, if those facts no longer exist, there may be no
    rational basis for the legislation.  See Carolene Products, 304 U.S. at 153-54.  Here, petitioner is
26  not challenging the facts which provide a rational basis for legislation.

23

1    Before addressing the parties' arguments, the court observes again that petitioner

2    did not raise this claim in his automatic direct appeal.  If he had, the issue would have been

3    preserved when the Supreme Court reviewed petitioner's case in Tuilaepa.  In this context, the

4    limitations on federal habeas review set forth in AEDPA would not have applied and petitioner

5    could have argued directly to the Supreme Court that Lockhart should be overturned.  Because

6    petitioner did not raise this claim on direct review, however, this court is limited in how it may

7    review the claim.  Specifically, petitioner first raised the claim in his second state habeas petition

8    and now presents it to this court in the context of a federal habeas petition.  Therefore, under

9    AEDPA, this court may only review the state court's decision to determine if it was based on an

10    objectively unreasonable application of clearly established law as set out by the Supreme Court.

11    As respondents note in their briefs, this court's review is even more limited.  This

12    court must review the state court's decision in light of the Supreme Court precedent which was

13    clearly established at the time the state court rendered its decision.  See Williams, 529 U.S. at

14    390; see also Jackson v. Giurbino, 364 F.3d 1002, 1005 (9th Cir. 2004).  Therefore, the inquiry

15    must center on the state of Supreme Court law as of February 2002 when the California Supreme

16    Court denied this claim.

17    Lockhart is a logical starting point.  In that case, the Supreme Court held that the

18    death qualification jury selection process does not violate the constitutional rights to an impartial

19    jury and a jury consisting of a fair cross-section of the community.  See Lockhart, 476 U.S. at

20    184.  The record in Lockhart contained various studies regarding the impact of the death

21    qualification process on juries.  See id. at 167-68.  The Supreme Court began its discussion by

22    considering those studies:

23        Before turning to the legal issues in the case, we are constrained to point
           out what we believe to be several serious flaws in the evidence upon
24        which the courts below reached the conclusion that "death qualification"
           produces "conviction-prone" juries.  McCree introduces into evidence
25        some 15 social science studies in support of his constitutional claims, but
           only 6 of the studies even purported to measure the potential effects on the
26        guilt-innocence determination of the removal from the jury of

"Witherspoon-excludables" [Witherspoon v. Illinois, 391 U.S. 510 (1968)].[12]  Eight of the remaining nine studies dealt solely with generalized attitudes and beliefs about the death penalty and other aspects of the criminal justice system, and were thus, at best, only marginally relevant to the constitutionality of McCree's conviction.  The 15th and final study dealt with the effects on prospective jurors of voir dire questioning about their attitudes toward the death penalty, an issue McCree raised in his brief to this Court but that counsel for McCree admitted at oral argument would not, standing alone, give rise to a constitutional violation.

Of the six studies introduced by McCree that at least purported to deal with the central issue in this case, namely, the potential effects on the determination of guilt or innocence of excluding "Witherspoon-excludables" from the jury, three were also before this Court when it decided Witherspoon.

Id. at 170.

While petitioner argues in his Rule 56(f) motion that the constitutional analysis would surely be different in light of more recent studies, the Supreme Court's decision in Lockhart did not depend on studies at all.  Before discussing why death qualification was not unconstitutional, the Supreme Court stated:

Having identified some of the more serious problems with McCree's studies, however, we will assume for purposes of this opinion that the studies are both methodologically valid and adequate to establish that "death qualification" in fact produces juries somewhat more "conviction-prone" than "non-death-qualified" juries.  We hold, nonetheless, that the Constitution does not prohibit the States from "death qualifying" juries in capital cases.

Id. at 173.

_____

[12]       In Witherspoon, jurors who held a conscientious objection to the death penalty were systematically excluded from the jury, regardless of whether such jurors could nonetheless carry out their duty to follow the law.  See Witherspoon, 391 U.S. at 513-15.  The Court stated: "If the State had excluded only those prospective jurors who stated in advance of the trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to penalty.  But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality.  In its quest for a jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to die." Id. at 520-21.  Thus, the death qualification process must include an inquiry as to whether a juror can set aside his beliefs and carry out his duty.

1      As to the Sixth Amendment fair cross-section right, the Supreme Court held that

2 the "essence of a 'fair cross-section' claim is the systematic exclusion of 'a "distinctive" group

3 in the community.'" Id. at 175 (citing, Duren v. Missouri, 439 U.S. 357, 364 (1979)).  The Court

4 stated that groups defined solely by shared attitudes – such as Witherspoon excludables – are not

5 "distinctive groups" for fair cross-section purposes.  See id.  While declining to precisely define

6 "distinctive groups," the Court noted that blacks, women, and Mexican-Americans were such

7 groups.  See id.  The Court also separated Witherspoon excludables from distinctive groups

8 because, unlike blacks, women, and Mexican-Americans, Witherspoon excludables are singled

9 out on the basis of an attribute that is within the individual's control – beliefs about the death

10 penalty and the ability to set those beliefs aside in deference to the rule of law.  See id. at 175-76.

11      As to the claim that death qualification violates the constitutional right to an

12 impartial jury, the Supreme Court stated that an impartial jury consists of nothing more than

13 jurors who will conscientiously apply the law and find the facts.  See id. at 177-78.  The Court

14 observed that the inquiry focuses on individual jurors and not on the jury as a whole.  See id. at

15 178.  In rejecting the claim, the Court held:

> . . . On a more practical level, if it were true that the Constitution required a certain mix of individual viewpoints on the jury, then trial judges would be required to undertake the Sisyphean task of "balancing" juries, making sure that each contains the proper number of Democrats and Republicans, young persons and old persons, white-collar executives and blue-collar laborers, and so on.
>
> * * *
>
> In our view, it is simply not possible to define jury impartiality, for constitutional purposes, by reference to some hypothetical mix of individual viewpoints. Prospective jurors come from many different backgrounds, and have many different attitudes and predispositions.  But the Constitution presupposes that a jury selected from a fair cross-section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.

Id. at 178, 183-84.

1    Applying AEDPA, the Ninth Circuit addressed death qualification in <u>Furman v.</u>

2  <u>Wood</u>, 190 F.3d 1002, 1004 (9th Cir 1999) (reviewing under both the "contrary to" and

3  "unreasonable application of" standards).  Commenting on <u>Lockhart</u>, the Ninth Circuit stated:

4           [T]o the extent that attitudes toward the death penalty influence
             deliberations, the Court found greater cause for concern in the prospect
5           that jurors who are hostile to the death penalty may be acquittal-prone.
             (citation to <u>Lockhart</u> omitted).  Furthermore, the Court ruled that, even if
6           it assumed that death qualified jurors are conviction-prone, the presence
             on the jury of jurors who are opposed to the death penalty is not protected
7           by the fair cross-section requirement.  (citation to <u>Lockhart</u> omitted).

8           <u>Id.</u> at 1004-05.

9  The Ninth Circuit also recognized that <u>Lockhart</u> rejected the argument that death qualification

10 violates the right to a fair and impartial jury.  <u>See id.</u> at 1005.  In light of the clear Supreme Court

11 precedent, the court in <u>Furman</u> held that the state court's rejection of the petitioner's death

12 qualification claims was neither "contrary to" nor an "unreasonable application of" <u>Lockhart</u>.

13 <u>See id.</u>  Thus, in 1999, <u>Lockhart</u> remained clearly established law.[13]

14          Between 1999 – when <u>Furman</u> was decided – and February 2002 – when the state

15 court denied petitioner's death qualification claim – the state of the law did not change.  Whether

16 or not studies had been produced during that time showing that the death qualification process

17 produced conviction-prone juries is irrelevant.  For <u>Lockhart</u> to no longer be considered the

18 clearly established Supreme Court precedent governing death qualification claims, the Supreme

19 Court itself would have to demonstrate a significant doctrinal shift by overturning the decision.

20 Because that has not happened, the court concludes that <u>Lockhart</u> was the clearly established law

21 in 2002, and remains so today.  Moreover, the existence of post-<u>Witherspoon</u> studies is simply

22 not relevant to the analysis.  The court finds that the state court's determination of petitioner's

23 death qualification claim was neither "contrary to" nor an "unreasonable application of"

24 <u>Lockhart</u>.   <u>Accord</u> <u>Scott v. Ryder</u>, 2007 WL 505117 (D. Ariz., Feb. 14, 2007).

25 _____

26    [13]    As in <u>Lockhart</u>, studies formed no basis for the decision in <u>Furman</u>.

1    For these reasons, petitioner's Rule 56(f) motion should be denied and

2  respondents' motion for summary judgment on this claim should be granted. Claim A should be

3  denied on the merits.

4      **C.    <u>Trial Court's Comments to the Jury (Claims C, D, F, and G)</u>**

5    Petitioner asserts four claims for relief based on comments the trial judge made to

6  the jury.  In particular, petitioner asserts that the trial judge erred in: (1) commenting on the

7  evidence in the middle of jury deliberations; (2) commenting on the jury's numerical division

8  during deliberations; and (3) singling out one juror.  Petitioner also asserts that the cumulative

9  effect of these alleged errors warrants habeas relief.  Both parties seek summary adjudication in

10  their favor as to these four claims.  In his motion for summary judgment, petitioner offers the

11  following introductory remarks concerning these claims:

12    Although Mr. Proctor's Amended Petition separates Claim C, D, F
      and G, they all allege the same constitutional violation, and are controlled
13    by the same principles of law – a defendant is entitled to an impartial jury,
      and the trial court is prohibited from coercing a jury to reach a particular
14    verdict.  <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 241 (1988).  Pursuant to
      <u>Lowenfield</u>, to determine whether the judge's comment was
15    impermissibly coercive, the reviewing court must evaluate the trial court's
      comments "in [their] context and under all the circumstances." <u>Id.</u> at 237;
16    <u>see Early v. Packer</u>, 537 U.S. 3 (2002) (per curiam) (acknowledging
      <u>Lowenfield</u> requires consideration of the "totality of the circumstances").
17    Accordingly, this Court must consider the different aspects of the trial
      court's comments, alleged separately as Claims C, D, & F, together to
18    determine whether the trial court's comments coerced the jury.  Claim G
      asserts that the errors alleged in those claims must be considered
19    cumulatively to assess prejudice.

20      1.    <u>Comments on the Evidence (Claim F)</u>

21    In the amended petition and in his motion for summary judgment, petitioner

22  challenges lengthy comments made by the trial judge during the deliberation process.

23  Specifically, petitioner argues that the following comments on the evidence coerced the jury's

24  verdict:

25    Ladies and gentlemen of the jury and the alternates, for the
      purpose of assisting you in deciding this case, I am permitted by the
26    constitution of California to comment on the issues, the evidence and the

testimony and credibility of any witness.  And it occurred to me that before you retired to continue your deliberations this morning that some comment along those lines might be of some assistance to you.

Now, you should keep in mind that my comments are intended to be advisory only, and are not binding on you, as you are the exclusive judges of the questions of fact submitted to you and of the credibility of the witnesses.  You should disregard any or all of the comments, if you do not agree, if they do not agree with your view of the evidence and the credibility of the witnesses.

Now, under California law, by definition , the word "homicide" means the killing of one human being by another, either lawfully or unlawfully.  Now, under the instructions that I've given you, the word homicide includes murder.  And I've given you in that connection instructions on first degree murder as well as instructions on second degree murder.  There is the word homicide, however, also means the lawful killing of another – of a person by another.  An that's in situations where the act occurs as a result of some excusable or justifiable – under the law – reason for killing.  In this particular case, we do not have a justifiable or lawful killing of a human being by another.  There shouldn't be any doubt in anyone's mind that the death, the killing of Bonita Bergh Stendal was an unlawful killing of her by another person.  There is absolutely no evidence whatsoever that she was killed in self defense or any other type of reason or that she killed herself.  There shouldn't be any doubt in anyone's mind on the facts that have been presented in this case, that we have an unlawful killing of Ms. Stendal by another person.

Now, the real question in this case is whether the State, the district attorney, has proved beyond a reasonable doubt that the defendant is legally responsible for the killing.  That's basically the issue here, as well as if the State has proved beyond a reasonable doubt that it's murder in the first degree or murder in the second degree.  And if they've proved beyond a reasonable doubt that it's murder in the first degree, you go on to whether they proved beyond a reasonable doubt any one or more of the special circumstances that have been mentioned.  And you are also called upon to determine as to whether they've proved beyond a reasonable doubt that the defendant committed the rape, whether they proved beyond a reasonable doubt the defendant committed a burglary.

Now, in that connection, there have been several statements attributed to the defendant out of court concerning his whereabouts and activities on the night of April the 21st and the early morning hours of April the 22nd.  These statements attributed to him are inconsistent with one another and are also inconsistent with his testimony here in court concerning his activities that evening and in the early morning hours of April the 22nd.

Now, the district attorney has placed him in the house of Bonita Bergh Stendal through three palm prints; one bloody right palm print, which I think Mr. Collins testified to, was created by blood being on the palm first and then transferred to the booklet.  In addition to that, Mr. Collins has testified there were two dry palm prints.  By that, they were latent.  There was a left palm print, which was latent, but that it had a chemical, had to be applied to one of the booklets to raise that palm print to where it could be seen.  And another dry palm print of the right palm.

1    Again, one that could only be seen after being treated with chemicals, and
     that was on a different booklet.

2           Now, the defendant has testified and given you an explanation as
     to what he did in that house that morning which explains the presence of

3    the bloody palm print, but does not explain the presence of the two dry or
     latent palm prints.  Under those circumstances, I have difficulty in

4    believing the testimony of the defendant.  Now, again, my comments are
     intended to be advisory only and are not binding on you as you are the

5    exclusive judges of the questions of fact submitted to you and of the
     credibility of the witnesses.  You should disregard any or all of the

6    comments that I've made if they do not agree with your views of the
     evidence and the credibility of the witnesses.

7

8    Petitioner argues that these comments resulted in error because: (1) the trial judge did not

9    correctly instruct the jury pursuant to CALJIC No. 17.32 that the purpose of judicial comments

10   is only to isolate issues of relevance and not to impose the court's will; (2) the trial judge

11   relieved the prosecution of its burden of proving that the killing of Mrs. Stendal was unlawful;[14]

12   (3) the trial judge improperly resolved for the jury the question of petitioner's credibility; and (4)

13   the trial judge improperly told the jury that the criminologist expert's opinion was conclusive.  In

14   sum, petitioner quotes Justice Mosk's dissent in his automatic direct appeal:

15          It is plain that the jury would have heard the court's comment as
            tantamount to an argument for conviction.  How could it not?  The

16          substance of the comment was the same as part of the prosecutor's
            summation: it added nothing and it subtracted nothing.  The prosecutor's

17          summation was, literally, an argument for conviction.  The court's
            comment effectively approved and adopted what was urged therein.  From

18          all that appears on the face of record, the court did not deliver the words in
            the passionate manner employed by the prosecutor.  But it delivered them

19          nonetheless.

20          It is also plain that the jury would have heard the court's comment to
            suggest that the court itself believed defendant was guilty.  Again, how

21          could it not?  Innocence depended on the credibility of defendant's
            exculpatory testimony.  The court expressed its own view on the question

22          in no uncertain terms: ". . . I have difficulty in believing the testimony of
            the defendant."

23

24          [14]     This argument is puzzling given that, as petitioner admits, his defense at trial was
     that he was not the killer.  His position was never that he killed her for some justifiable reason.

25   In the amended petition, petitioner states: "The defense position was that circumstances
     suggested that Manley, rather than defendant, was the killer."  Moreover, as respondents note,

26   petitioner admitted on direct appeal that this was a nonissue.

1                * * *

2         . . . The court's erroneous comment was its final remark.  Evidently, it was
dispositive.  About four hours thereafter, the jury returned guilty verdicts
3         on all the charges and true findings on all the allegations – even though it
had been unable to agree on any verdict or finding in the approximately
4         nine hours that preceded.

5         Proctor, 4 Cal.4th at 565-66 (Mosk, J., dissenting).

6          In their answer, respondents argue that there is no clearly established Supreme

7 Court precedent addressing the constitutionality of a trial judge's comments on credibility.[15]  If

8 the court agrees, the result of such a finding would be that relief on this claim is not available

9 under AEDPA.  See Williams, 529 U.S. at 412; Alvarado v. Hickman, 316 F.3d 841, 852 (9th

10 Cir. 2002).  If the court disagrees, then relief would only be available if the state court's

11 determination was either contrary to or an unreasonable application of clearly established law.  If

12 the court presumes, without making a specific finding, that clearly established Supreme Court

13 precedent governing this claim exists, and also concludes that the state court's determination was

14 neither contrary to nor an unreasonable application of that law, relief would not be available.  If

15 this is the case, then the question of whether there is clearly established law would become moot

16 because the result would be the same under either theory – petitioner would not be entitled to

17 relief.[16]

18 / / /

19 / / /

---

20      [15]      Respondents argue alternate theories.  In their answer, respondents argue that
21 AEDPA deference applies.  In making this argument, respondents assert that the state court
adjudicated the instant federal claim on the merits because it referenced state law more stringent
22 than the federal standard and because the state law, in turn, referenced Supreme Court precedent.
However, as to whether relief is warranted under AEDPA, respondents also argue that there is no
23 clearly established Supreme Court precedent governing this claim and, therefore, the state
court's decision cannot be an unreasonable application of non-existent law.

24

25      [16]      Obviously, if the court concludes that the state court's determination of this claim
was either contrary to or an unreasonable application of presumed clearly established law, it
would have to make a specific finding that such clearly established law in fact existed before the
26 court could recommend granting relief.

1    Presuming that there is clearly established law governing Claim F, several Ninth

2    Circuit cases shed light on what that law is.  The general rule is that comments by the trial judge

3    violate constitutional right to trial by jury if they coerce a verdict.  See Gonsior v. Craven, 449

4    F.2d 20, 21 (9th Cir. 1971); Jiminez v. Myers, 40 F.3d 976, 979 (9th Cir. 1993).  In Rodriguez v.

5    Marshall, the court held that the trial judge can make comments and call the jury's attention to

6    parts of the evidence so long as the comments neither distort the evidence nor add to it, and the

7    judge reminds the jurors of their exclusive duty to determine facts.  See 125 F.3d 739, 749 (9th

8    Cir.1997) (citing Quercia v. U.S., 289 U.S. 466, 469 (1932)).  Thus, the comments, evaluated in

9    light of the totality of the circumstances, may not distort the evidence or add to it.

10   See Rodriguez v. Marshall, 125 F.3d 739, 748-49 (9th Cir. 1997).  There is no constitutional

11   error if the trial judge stresses that the comments are advisory only and that the jurors are the

12   sole arbiters of the facts.  See Davis v. Craven, 485 F.2d 1138, 1142 (9th Cir. 1973); cf Jiminez,

13   40 F.3d at 981 (noting that failure to remind the jury that it was the sole arbiter of guilt strongly

14   supports the conclusion that the jury was impermissibly coerced).

15   In their reply to petitioner's motion for summary judgment on this claim,

16   respondents argue that this claim should be denied on the merits because the trial judge told the

17   jurors on two separate occasions – before and after his comments – that they were the exclusive

18   judges of the facts and credibility and that his comments were not binding.  A review of the trial

19   judge's comments in this case reveals that respondents are correct regarding the admonitions

20   given by the trial judge.  Just prior to making his comments on petitioner's credibility, the judge

21   stated:

22          Now, you should keep in mind that my comments are intended to
       be advisory only, and are not binding on you, as you are the exclusive
23     judges of the questions of fact submitted to you and of the credibility of
       the witnesses.  You should disregard any or all of the comments, if you do
24     not agree, if they do not agree with your view of the evidence and the
       credibility of the witnesses.

25

26   / / /

And, at the conclusion of his comments, the judge repeated the admonition:

> . . . Now, again, my comments are intended to be advisory only and are not binding on you as you are the exclusive judges of the questions of fact submitted to you and of the credibility of the witnesses. You should disregard any or all of the comments that I've made if they do not agree with your views of the evidence and the credibility of the witnesses.

Because, on both occasions, the trial judge instructed the jury that they were the sole arbiters of the facts and that they could disregard his comments, the court finds the admonitions to be adequate in light of the law outlined above.  See Davis, 485 F.2d at 1142.  While petitioner argues in the amended petition that the court "omitted constitutionally required warnings" and that the trial judge should have instructed the jury pursuant to CALJIC No. 17.32, he does not point to any authority requiring this specific language.

Having concluded that the trial judge gave the proper admonitions with his comments on petitioner's credibility, the court next examines whether the trial judge's comments either distorted the evidence or added to it, or both.  In his motion for summary judgment, and his reply to respondents' motion for summary judgment, petitioner argues that the trial judge's comments distorted the evidence.[17]  In particular, he challenges the trial court's statement to the jury that he had a hard time believing petitioner's testimony given that petitioner did not explain the latent palm prints.  The court does not agree that this distorted the evidence.  First, the trial judge did nothing more than comment on the evidence in stating that petitioner's testimony did not explain the latent prints.  The statement does not direct a particular conclusion such that it could be coercive.  Similarly, the judge's statement that he had a hard time believing petitioner's testimony was simply his view of the evidence which does not violate the constitution in light of the admonitions given at both the beginning and end of the judge's comments.  As the California

---

[17]     Interestingly, petitioner does not assert this argument in his amended petition.  Rather, petitioner argues in the amended petition that the trial judge's comments essentially resolved questions of fact, thereby usurping the jury's role and coercing a verdict.  Petitioner never argues that the trial judge added to the evidence.

1   Supreme noted in petitioner's direct appeal:

> In the present case, the trial court essentially observed that defendant had
> made inconsistent statements concerning his whereabouts during the
> pertinent period, and that defendant's testimony as to his presence in the
> residence, while explaining the presence of the bloody palm print, did not
> explain the presence of the two dry or latent palm prints, causing the trial
> court to entertain doubts as to defendant's credibility. The trial court did
> not inaccurately state or distort any testimony . . . and its comment that
> defendant's testimony "explains the presence of the bloody palm print"
> permitted an inference more helpful to defendant than the jury might have
> drawn in the absence of the comment. Although the court commented
> upon defendant's credibility in a specific context, it did not comment on
> the defendant's guilt or innocence, nor did it direct that the jury reach a
> given verdict. Moreover, both prior to and after its comments, the court
> admonished the jury that it was free to disregard those comments. We
> conclude that the trial court's remarks fell within the scope of the
> constitutional privilege.

Proctor, 4 Cal.4th at 542-43.

Because the trial court properly instructed the jury -- before and after the comments on the evidence -- that the jury was the sole arbiter of the facts and that they were free to disregard the judge's statements, and because the judge's comments neither distorted nor added to the evidence, relief is not warranted. It is not necessary to this conclusion to decide whether there is clearly established Supreme Court precedent on this claim because, even if there is not, the result would be the same. Therefore, respondents' motion for summary judgment on Claim F should be granted and petitioner's motion for summary judgment on this claim should be denied. Claim F should be denied on the merits.

2.      Inquiry as to the Jury's Numerical Division (Claim C)

According to petitioner, after the jury had been deliberating less than six hours, the foreperson conveyed a message to the trial judge that there was an impasse and that guidance as to how to proceed was needed. He states that the trial judge immediately asked for a numerical count and, when he learned that the count was 11 to 1, he ordered a recess to allow the jury to rest. Petitioner argues: "The obvious message was that the jury's division was not merely 'of importance,' but the only topic worthy of attention. The court showed no interest in and

34

mentioned nothing else, and did nothing in response.  Thus, the jurors were told that there was something 'wrong,' to be 'cured' by a good night's rest, about that numerical division."  Petitioner concludes that this denied him a fair trial under the standard of <u>Lowenfield</u> which prohibits the judge from coercing the jury to reach a particular verdict.  <u>See</u> 484 U.S. at 241.

The California Supreme Court addressed this claim in petitioner's direct appeal and stated:

> At 4 p.m. on . . . the first full day of deliberations, the jury conveyed a message to the court that the jury had reached an impasse and was requesting guidance as to how to proceed.  The court, stating it had received the jury's message, requested that the jury foreman inform the court as to the numerical division of the jurors, without revealing the respective numbers for a guilty or a not guilty verdict.
>
> Defendant contends the court's inquiry into the jury's numerical division impaired the fairness of the trial.  "[T]he practice of inquiring into the jury's numerical division, without finding out how many are for conviction and how many are for acquittal, was expressly approved in [<u>People v.</u> <u>Carter</u> [(1968) 68 Cal.2d 810, 815]."  (additional citation omitted).  Such inquiry is justified in the discharge of the court's "statutory responsibility of assuring that a verdict is rendered 'unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' (Pen. Code, § 1140)."  (additional citation omitted).

<u>Proctor</u>, 4 Cal.4th at 538.

The state court then noted that, although the federal rule is otherwise, that rule is not binding on the states and continued:

> . . . In view of the circumstance that the court inquired in a neutral manner as to the numerical count in order to determine whether further deliberations would be productive, we decline to disapprove the practice as it was employed in the present case.
>
> We also disagree with defendant's contention that the court's order declaring a recess until the following morning, once it had ascertained the vote was split, implied the court had found "something wrong" with the vote which might be remedied by a night's rest.  The determination, pursuant to section 1140, whether there is a "'reasonable probability'" of agreement, rests within the sound discretion of the trial court. (citations omitted).  Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency (citation omitted), the court may direct further deliberations upon its reasonable conclusion that such

35

> direction would be perceived "'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.' [Citation]." (citations omitted). Nothing in the trial court's comment in the present case properly may be construed as an attempt to pressure the jury to reach a verdict; the court correctly concluded there was a reasonable probability the jurors could agree on a verdict.

Id. at 539.

In their answer to this claim and in their motion for summary judgment, respondents argue, as they do with respect to Claim F regarding the court's comments on petitioner's credibility, that there is no clearly established law governing this claim. See Lowenfield, 484 U.S. at 240 n.3 (concluding that the federal rule prohibiting a judge from inquiring about the numerical division of a deliberating jury is not constitutionally based). Respondents also argue that, in any event, there was no coercion because the trial judge was neutral in his inquiry, being careful not to ask where the jury stood on guilt or acquittal. Respondents assert that the neutral manner of the court's inquiry belies any indication of pressure or coercion.[18]  Their reasoning is that neutral comments cannot impermissibly coerce the jury to reach any particular verdict because such comments do not suggest one verdict over another. Because there is either no law controlling this claim, or because there can be no dispute that the trial court was neutral in its inquiry and, therefore, not coercive, respondents conclude that petitioner is not entitled to relief on Claim C.

As with Claim F, discussed above, it is not necessary to decide whether there is clearly established law if, presuming Lowenfield controls, the court concludes that no error occurred.  If Lowenfield controls, the court must agree with respondents.  Their argument is based on sound logic -- if the judge's comment was neutral with respect to the verdict, then the comment cannot be said to have coerced any particular verdict.  The record makes clear that the

---

[18]     Respondents cite to Lowenfield for the general proposition that, if this case represents controlling Supreme Court precedent, the rule is simply that jury polling must not be coercive.

1  judge never asked which way the jury was leaning.  To the contrary, the judge specifically

2  stated:  "Without telling me which way the numeral [sic] count is, would you tell me what the

3  numerical count is.  Don't tell me which way, but what is the numerical count."  Proctor, 4

4  Cal.4th at 538 n.6.  Based on this record, the court concludes that the judge's comments were

5  neutral as to the verdict.  At best, the judge's comment could be seen as encouraging the jury to

6  continue deliberating in order to reach a verdict, which is the judge's statutory duty in California.

7  See id. at 538-39.

8          In his motion for summary judgment, petitioner contends that relief is warranted

9  on this claim because inquiry into the numerical breakdown of a deadlocked jury is deemed to be

10 coercive.  See Brasfield v. United States, 272 U.S. 448 (1926); Lowenfield, 484 U.S. at 239.

11 This argument is unpersuasive because there is no indication that the jury was deadlocked at the

12 time the judge made the inquiry, or ever.  The foreperson stated that the jury was "at an impasse"

13 as to how to proceed.  This is not the same as being deadlocked as to a verdict in the sense that it

14 could not reach a verdict even if it proceeded further.  The very indication that the jury needed

15 guidance as to how to proceed indicates that the jury believed it could proceed.

16         Petitioner also argues that some error is to be found because the jury indicated

17 that it had only deliberated the murder charge.  The basis of this argument is that, given the other

18 charges against petitioner, the judge suggested by the order to recess that the jury could go no

19 further until it was able to reach a verdict on the murder charge.  There is some initial attraction

20 to this argument because, of course, the judge could have told the jury to continue their

21 deliberations by moving on to the next charge and, by not doing so, he improperly focused the

22 jury on the murder charge.  The court, however, does not see how this could be coercive.   The

23 trial judge was within his sound discretion under California law to direct further deliberations as

24 are appropriate under the circumstances.  Given the circumstance of the jury's impression that it

25 had reached an "impasse," a resting period was sensible.  Additionally, it would not make sense

26 to tell the jury to move on to another charge.  Because, the jury had already spent time

37

1  deliberating the murder charge, directing them to continue deliberating other charges would have

2  resulted in confusion and a waste of time when the jury returned to the murder charge.  And,

3  ultimately, it cannot be ignored that the comments were entirely neutral.

4          Next, petitioner argues that the state court considered only the actual statement

5  made by the trial court, thereby failing to consider all the circumstances of the comment, as

6  required by Lowenfield.  Again, the court finds that this argument is not particularly persuasive.

7  There simply was no need to consider any circumstance other than the comments themselves

8  because they clearly demonstrated neutrality.  This neutrality rendered petitioner's argument to

9  the California Supreme Court without merit, as it does here.  Moreover, nothing in the

10  circumstances of the comment indicates coercion.

11          Given the neutrality of the trial judge's comments, they could not have coerced

12  the jury to reach any particular verdict.  In addition, the jury was never deadlocked.  Therefore,

13  petitioner is not entitled to relief on this claim.[19]  Respondents' motion for summary judgment on

14  Claim C should be granted and petitioner's motion for summary judgment on this claim should

15  be denied.  Claim C should be denied on the merits.

16          3.      Juror Singled Out (Claim D)

17          In a different approach to petitioner's challenge to the judge's comment on the

18  jury's numerical division, petitioner argues in Claim D that the trial judge erred in "singling out"

19  the lone dissenting juror -- Juror Turner.  In the amended petition, petitioner argues that Juror

20  Turner was "subjected to an additional vulnerability to pressure" because she was the only

---

21

22      [19]      As with Claim F, if there is no clearly established law, petitioner would not be
    entitled to relief.  See Williams, 529 U.S. at 412.  If there is clearly established law, petitioner
23  would still not be entitled to relief because court's comment did not violate that law.  The
    question of whether there actually is clearly established law is rendered moot.

24          Presuming, however, that there is clearly established law, the "unreasonable
    application of" standard of review applies.  The court rejects petitioner's argument that the
    California Supreme Court failed to consider the constitutional aspect of his claim.  In particular,
25  the court notes that the state court held that the trial judge's comment could not be coercive as to
    a particular verdict because it was neutral.  This analysis encompasses the Lowenfield standard.
26  Therefore, the state court applied the correct presumed clearly established law.

1   African-American on the jury and because she was the one hold-out for acquittal on the murder

2   charge.[20]  Petitioner adds: "Juror Turner, a person already susceptible to feeling ostracism and

3   disapproval was singled out for special attention in front of her peers because she did not agree

4   with them."  As to how the trial judge "singled out" Juror Turner, petitioner states that, at one

5   point, "the court referred to her as the 'black lady.'"  Other than this comment, petitioner's

6   assertion of error regarding Juror Turner is based on the judge's inquiry into the jury's numerical

7   division.[21]

8               In their answer, respondents note that petitioner cites to no authority in the

9   amended petition in support of this argument, and does not explain how any comment by the

10  judge as to Juror Turner coerced a particular verdict.  Respondents point to Early v. Packer in

11  support of their conclusion that Claim D lacks merit.  Specifically, respondents state that, in

12  Early, the Supreme Court upheld a conviction even though the trial judge read a note from the

13  jury which singled a juror out by name and accused her of not following the jury instructions.

14  See Early, 536 U.S. at 4-5.  Respondents observe that this "singling out" was more extreme than

15  the comments by the trial judge in petitioner's case.

16              As with Claims F and C, the parties dispute whether there is clearly established

17  law addressing a claim that the trial judge impermissibly singled out a juror by commenting on

18  the jury's numerical division.  Therefore, the court will use the framework for review used for

19  Claims C and F.  Specifically, the court will presume that Lowenfield represents clearly

20  established law and that the test is whether the comments coerced a particular verdict.  If

21  petitioner is not entitled to relief under this test, it does not matter whether or not there is clearly

22  _____

23  [20]       As discussed above, the trial judge did not actually know which way the hold-out juror was leaning at the time.

24  [21]       Aside from the state court's discussion of the trial judge's comments on the jury's division, the California Supreme Court did not specifically address Claim D.  However, because

25  petitioner's argument is based on the notion that Juror Turner was singled out by the judge's comments on the jury's numerical division, this court finds that the California Supreme Court

26  adequately addressed this claim in its discussion of Claim C.

1   established law because, if there is not, petitioner would also not be entitled to relief.

2   Turning to the trial court's comments, petitioner's claim is based on the following

3   comments:  (1) the trial judge's comments on the jury's numerical division which ultimately

4   identified Juror Turner as the lone dissenting juror; and (2) the trial judge's reference to Juror

5   Turner as the "black lady."  Under Lowenfield, as discussed in greater detail above, the general

6   question is whether these comments coerced the jury to reach a particular verdict.  Based on the

7   court's discussion above with respect to Claim C, the trial court's comments on the numerical

8   division of the jury were neutral.  There is nothing in the identification of Juror Turner as the

9   holdout juror which would tend to erode this neutrality because Juror Turner's position was not

10   sought or disclosed.  Petitioner recognizes as much in the amended petition when he states that

11   Juror Turner was singled out as the "holder of a different opinion as to petitioner's guilt."

12   Significantly, petitioner never asserts that the trial judge asked what Juror Turner's opinion was

13   or that Juror Turner's opinion was disclosed.   In any event, neither occurred.

14   Petitioner also appears to assign error to the trial judge's reference to Juror Turner

15   as the "black lady."  Again, the court will presume that Lowenfield is the controlling law.  Under

16   this standard, the court concludes that this reference did not affect the neutrality of the judge's

17   other references to the numerical division of the jury in general or Juror Turner in particular.

18   There is nothing inherent in the reference to Juror Turner's race -- one which was a distinct

19   minority in the community -- to suggest that the trial court favored one verdict over another.

20   For these reasons, respondents' motion for summary judgment on Claim D should

21   be granted and petitioner's motion for summary judgment on this claim should be denied.  Claim

22   D should be denied on the merits.

23   4.   Cumulative Effect (Claim G)

24   Claim G is based on the theory that the state court failed to adhere to Lowenfield

25   by discussing "the relevant circumstances that must be considered in toto."  See Lowenfield, 484

26   U.S. at 237.  Specifically, petitioner re-asserts the arguments raised in Claims F, C, and D and

agues that, considered cumulatively, relief is warranted.  Respondents summarize their position

succinctly as follows:  "Briefing on the [jury] deliberation issues is adequate. . . ."

The court agrees with respondents that the discussion of Claims F, C, and D

suffices to resolve this claim, as framed by petitioner.  Put simply, there was no jury coercion

under Lowenfield.  For this reason, respondents' motion for summary judgment on Claim G

should be granted and petitioner's motion for summary judgment on this claim should be denied.

Claim G should be denied on the merits.

**D.      Sufficiency of the Evidence (Claims J, K, L, M, N, O, Q, and S)**

Petitioner asserts eight claims based on the sufficiency of the evidence.  In Claim

N, petitioner argues that there was insufficient evidence to support felony murder based on rape.

He does not, however, challenge the special circumstance finding of murder based on rape.  In

Claim J, petitioner alleges that there was insufficient evidence to support felony murder based on

burglary.  Petitioner concludes that, absent facts sufficient to establish felony murder based on

burglary, the special finding of murder in the course of burglary is also not supported by the

evidence.  In Claim O, petitioner asserts that there was insufficient evidence to prove first degree

murder based on premeditation and deliberation.  In Claim S, petitioner argues that the evidence

was not sufficient to support the torture special circumstance finding.  Finally, in Claim Q,

petitioner states that the cumulative effect of claimed errors resulting from insufficient evidence

warrants habeas relief.

Three of petitioner's sufficiency of the evidence claims -- Claims K, L, and M --

relate to torture murder.  In the remaining portion of Claim K, petitioner states that there is a

significant difference between a torture special circumstance finding and torture murder, and

asserts that the evidence does not establish torture murder.[22]  In Claim L, petitioner argues that

the evidence does not support instructing the jury pursuant to CALJIC No. 8.24.  Claim M

---

[22]      The portion of Claim K raising a causal connection argument has been dismissed.

1  challenges the California Supreme Court's finding that California law does not require that any

2  specific act of torture actually cause the victim's death.

3           When a challenge is brought alleging insufficient evidence, federal habeas corpus

4  relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the

5  light most favorable to the prosecution, no rational trier of fact could have found proof of guilt

6  beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[23]  Under

7  Jackson, the court must review the entire record when the sufficiency of the evidence is

8  challenged on habeas.  See id.  It is the province of the jury to "resolve conflicts in the testimony,

9  to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id.

10  "The question is not whether we are personally convinced beyond a reasonable doubt.  It is

11  whether rational jurors could reach the conclusion that these jurors reached."  Roehler v. Borg,

12  945 F.2d 303, 306 (9th Cir. 1991); see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993).  The

13  federal habeas court determines sufficiency of the evidence in the context of the substantive

14  elements of the criminal offense, as defined by state law.  See Jackson, 443 U.S. at 324 n.16.

15           Before continuing, the court must comment on petitioner's argument concerning

16  the effect of some of these claims on the verdict as a whole.  As to Claims J, K, L, M, N, and O -

17  - which together challenge the alternate factual bases put forward by the prosecution to support

18  first degree murder -- petitioner argues:

19                    This failure of proof . . . invalidates the entire guilt-phase result.
                     When a case is submitted to the jury on alternative theories, and it is
20                    impossible to determine on which theory the verdict of guilt relied, the
                     unconstitutionality of any of the theories requires that the conviction be
21                    set aside.

22

23           [23]      Even though Jackson is a pre-AEDPA case, this expression of the law is valid
     under AEDPA's standard of federal habeas corpus review.  A state court decision denying relief
24   in the face of a record establishing that no rational jury could have found proof of guilt beyond a
     reasonable doubt would be either contrary to or an unreasonable application of the law as
25   outlined in Jackson.  Cf. Bruce v. Terhune, 376 F.3d 950, 959 (denying habeas relief on
     sufficiency of the evidence claim under AEDPA standard of review because a rational jury could
26   make the finding at issue).

1    The court, however, cannot find any citation to authority in the amended petition or any of

2    petitioner's briefs supporting this significant proposition.  Nor does petitioner challenge

3    respondents' argument that Griffin v. United States, 502 U.S. 46 (1991), expresses the law

4    applicable to these claims.  In Griffin, the jury returned a general guilty verdict on a multiple-

5    object conspiracy charge.  The Supreme Court concluded that due process does not require the

6    verdict to be set aside for insufficiency of the evidence as long as the evidence was sufficient to

7    support a conviction on at least one object.  See id. at 59.  Thus, where there are alternate factual

8    bases for a finding of guilt under a single theory of criminal liability – first degree murder, for

9    example – insufficient evidence as to one basis does not warrant reversal as long as the evidence

10   is sufficient as to any other basis.

11            Petitioner's rule of law would apply if one of the theories supporting a general

12   guilty verdict was legally inadequate (i.e., the action in question is protected by the Constitution

13   or fails to come within the statutory definition of the crime) because "there is no reason to think

14   that [the jury's] own intelligence and expertise will save them from . . . error."  Id. at 59.

15   Insufficient evidence goes to factual, as opposed to legal, adequacy.  "[J]urors are well equipped

16   to analyze the evidence. . . ." Id. (emphasis in original); cf. Zant v. Stephens, 462 U.S. 862, 880-

17   84 (1983) (refusing to set aside a capital conviction because one of the alleged aggravating

18   circumstances was found to be unconstitutionally vague because the jury made specific findings

19   as to other, legally and factually adequate aggravating circumstances).

20            Petitioner in fact appears to concede the applicability of Griffin.  In supplemental

21   briefing filed in support of Claims K and L, he states that "when the trial court instructs on a

22   factually inadequate theory of guilt, relief is required unless there is another theory of guilt for

23   which the evidence was sufficient."  He acknowledges the impact of this principle on his case by

24   arguing that none of alternate bases for first degree murder were supported by sufficient

25   evidence.  The converse of this expression is that, as long as the evidence is sufficient on at least

26   one of the alternate factual bases for first degree murder, petitioner is not entitled to relief due to

1  a failure of proof on any particular basis.  This is precisely the holding in <u>Griffin</u>.

2       The court, therefore, concludes that <u>Griffin</u> applies to its analysis of petitioner's

3  claims of insufficient evidence and that relief is not warranted on any particular claim if the

4  evidence is sufficient on at least one factual basis of first degree murder.

5         1.   <u>Felony Murder Based on Rape (Claim N)</u>

6       Petitioner's claim is straightforward:  "No evidence was presented from which the

7  prosecution could link Mr. Proctor to the rape of the victim."  He adds:

8      a.   Evidence that petitioner was in the victim's home on the night of the crime
    does not prove that he raped her.

9

10     b.   Abrasions and other scraping injuries on petitioner's lower legs were
    observed two days after the crime.  Petitioner's legs were examined by the
    coroner, who testified that he had previously examined suspects in sexual

11     assault cases and that he had seen these type[s] of injuries in sexual assault
    cases.  This testimony however was insubstantial and insufficient to

12     establish that petitioner committed a rape.

13     c.   The victim's hands had been tied with knots that were identified at trial as
    "trucker's hitches."  The jury was also presented with testimony that

14     established that petitioner had been in a class where instruction was given
    in tying a "trucker's hitch."  At most, this testimony demonstrates that

15     whoever killed Stendal bound her hands, that the knots used to restrain her
    were common, and that Mr. Proctor had taken a class at which these knots

16     were taught.  No evidence was presented that Mr. Proctor actually learned
    the knots, that he was the one who restrained the victim, or that whoever

17     restrained the victim raped her as well.

18 Respondents argue that, under the <u>Jackson</u> standard, this court must review the evidence in the

19 light most favorable to the prosecution and that, in this light, the state court's determination

20 cannot be an unreasonable application of clearly established law, or an unreasonable

21 determination of the facts. Specifically, in their motion for summary judgment, respondents

22 assert that the following facts, when viewed in the light most favorable to the prosecution, would

23 allow a reasonable jury to conclude that petitioner raped Mrs. Stendal:

24     1.   A short time prior to the commission of the present offenses, petitioner
    participated in making telephone calls of a harassing nature to various

25     persons;

26

2.      Petitioner was present when his companion Robert Manley made a call of a sexual nature to Mrs. Stendal;

3.      On the evening the offenses were committed, petitioner informed Robert Manley that he was going tp "pick up a woman," and told Jeffrey Bohall that he was going to "get a piece of butt;"

4.      An unfiltered cigarette butt was found just outside Mrs. Stendal's residence and petitioner had received a pack of unfiltered cigarettes from Manley a few hours before the murder;

5.      Petitioner admittedly was present inside Mrs. Stendal's residence on the night of the murder;

6.      Mrs. Stendal was tied in a manner consistent with petitioner's education in trucker's knots;

7.      Mrs. Stendal was forcibly raped prior to her murder;

8.      Mrs. Stendal suffered nonsexual injuries that were methodically inflicted;

9.      Approximately one day after the murder, police observed abrasions on petitioner's legs that were incurred while his legs were unclothed and were consistent with sexual assault cases; and

10.     Within hours of Mrs. Stendal's murder, petitioner was observed walking down the street 500 feet from her residence.

As to Claim N, the California Supreme Court addressed the issue in petitioner's direct appeal and stated:

Defendant urges that the only items of evidence linking him to the commission of the rape are the unfiltered cigarette butt found near the residence, his presence in the residence on the night in question, and certain marks on his legs which an expert opined were similar to marks seen on other perpetrators of sexual assaults.  Defendant ignores the additional circumstantial evidence that a short time prior to the commission of the present offenses, he participated in making telephone calls of a harassing nature to various persons and was present when his companion made a call of a sexual nature to the murder victim.  On the evening the offenses were committed, defendant informed one witness that he was going to "pick up a woman," and another that he was going to "get a piece of butt."  The evidence that Mrs. Stendal was forcibly raped, prior to her death, was uncontradicted.  This evidence, considered with the circumstances that the victim was tied in a manner consistent with defendant's formal education in the art of trucker's knots, that the abrasions below the defendant's knees and above his right knee were incurred by defendant while his legs were unclothed, and that these abrasions were consistent with injuries observed in other cases of sexual assault, amply support the jury's implied finding that defendant

45

specifically intended to commit rape and that the rape was not a mere incident of the murder.

Proctor, 4 Cal.4th at 532-33.

Petitioner does not dispute that this decision is based on the prosecution's view of the evidence. By considering the evidence in the light most favorable to the prosecution in deciding whether a rational jury could imply that petitioner was the rapist, the California Supreme Court applied the correct clearly established law under Jackson.[24]  Therefore, this court must give the state court deference and may only recommend granting relief if the state court's decision was an unreasonable application of Jackson.[25]

At the outset, the court notes that petitioner is not claiming that the prosecution failed to establish the necessary elements under California law to prove that Mrs. Stendal was forcibly raped.  Rather, petitioner claims that the evidence was not sufficient to establish that he was the one who committed the rape.  Therefore, because it is undisputed that someone committed the crime of rape, it is not necessary to discuss the proof of specific elements of the crime.[26]  Rather, the inquiry centers on the proof of petitioner's involvement in the crime.  In this regard, the court is mindful that the California Supreme Court described the evidence relating to

---

[24]    While the state court concluded that the evidence "amply supported the jury's implied finding" that petitioner committed the rape, it later referred to what "a rational trier of fact could conclude."  Proctor, 4 Cal.4th at 532-33.

[25]    As with many of his other claims, petitioner contends that the California Supreme Court did not address the constitutional aspect of this claim.  The court rejects this contention. Because the evidence must be viewed in the light most favorable to the prosecution, and because the California Supreme Court did just that, the court also rejects petitioner's suggestion that the state court's determination was based on an unreasonable determination of the facts.  The Jackson standard allows only one determination of the facts -- the one most favorable to the prosecution.

[26]    In his motion for summary judgment, petitioner argues for the first time that "no reasonable inference of an intent to rape could be drawn from any of the circumstantial evidence."  The amended petition is clear, however, that petitioner's claim regarding intent, as set forth in Claim J, is that the evidence does not establish that petitioner formed an intent to rape before he entered the Stendal residence.  Claim N questions whether the evidence supports the inference that petitioner was the rapist, not that someone formed the intent to rape Mrs. Stendal.

petitioner's activities "in substantial detail" due to "the circumstantial nature of the evidence

connecting defendant to the commission of the crimes" and petitioner's defense that someone else

was the perpetrator.  See Proctor, 4 Cal.4th at 517-18.

In his opposition to respondents' motion for summary judgment, petitioner argues

that the state court relied on impermissible inferences.  For example, petitioner states:

> . . . They point to the evidence of Robert Manley's obscene phone
> call to Ms. Stendal, made in Mr. Proctor's presence and Mr. Proctor's
> statements to another friend that he was going to pick up a woman.  The
> state court's reliance on these facts to infer Mr. Proctor had the requisite
> intent to rape Ms. Stendal was unreasonable . . .

This argument, however, is conclusory in that it does not explain why these facts do not support

the inference.  Additionally, petitioner's argument is somewhat confused in that Claim N relates to

whether he was the one who raped Mrs. Stendal, and not whether the particular element of intent

had been established.  As discussed below, petitioner raises the issue of intent to commit rape in

Claim J.  This argument is also not particularly persuasive given that it presumes the state court

considered this specific evidence in a vacuum.  In any event, when viewed in the light most

favorable to the prosecution, the obscene phone calls and petitioner's statements that he was

going to pick up a woman" and "get a piece of butt" reasonably suggest a sexual intent.

He also states that he ". . . could have scraped his knees in numerous ways other

than during a sexual assault."  Petitioner acknowledges the coroner's expert testimony that the

scrapes were consistent with sexual assault cases, but argues that innocent inferences could be

drawn from the injuries.  While it is certainly true that there may have been an innocent

explanation for the scrapes on petitioner's knees, when viewed in the light most favorable to the

prosecution, as required by Jackson, and in conjunction with the coroner's testimony, a rational

jury could conclude that petitioner scraped his knees while committing a sexual assault.  This

would not have been an inappropriate inference.

/ / /

/ / /

1    As another example of an "inappropriate inference," petitioner argues:

2        An inference that Mr. Proctor was the one who tied up the victim
     simply because he knew how to tie [the] exceedingly common [trucker's
3    hitch] knot is not proper because there are numerous alternative, innocent
     inferences that could be drawn from the fact that this particular knot was
4    used.

5  Again, while petitioner is correct that innocent inferences could be drawn from the facts

6  concerning the "trucker's knot," the evidence must be viewed in the light most favorable to the

7  prosecution's case.  Viewed in this light along with all the other circumstantial evidence of

8  petitioner's involvement in the crimes, a rational jury could conclude that petitioner tied the knots

9  used to restrain Mrs. Stendal.  It stands to reason that a person takes a class in order to learn what

10 is being taught.  Therefore, the jury could reasonably infer that petitioner learned the "trucker's

11 hitch" from the class he took just weeks before the murder.  Coupled with the undisputed fact that

12 Mrs. Stendal was forcibly raped, that petitioner took the class where the specific knots were

13 taught, and all of the other circumstantial evidence, it was reasonable for the jury to infer that

14 petitioner restrained Mrs. Stendal as part of that rape.

15     This court cannot say that the California Supreme Court's determination of this

16 claim was an unreasonable application of Jackson.  The state court outlined sufficient facts which,

17 when viewed in the light most favorable to the prosecution, support reasonable inferences that

18 petitioner committed the rape.  The evidence established that petitioner took a four-week truck-

19 driving course at which students were taught various knots, one of those being the knot used to

20 restrain the victim.  While there is no direct evidence that petitioner actually learned the knot in

21 question, the jury could reasonably infer that he did, given that he took the course and that the

22 knots were taught.  Next, the evidence established that petitioner and Manley made obscene

23 phone calls and that petitioner made statements indicating sexual intentions.  The evidence also

24 shows that Manley gave petitioner a pack of unfiltered cigarettes.  A cigarette butt from the same

25 brand was later found near the crime scene.  This could reasonably connect petitioner to the crime

26 scene.  Additionally, on the morning of April 22, petitioner was seen 500 feet from the Stendal

48

residence.  Finally, petitioner admits that he was in the Stendal residence on the night of April 21-22, 1982.

Aside from the evidence of abrasions on petitioner's legs, which the coroner testified were consistent with sexual assault cases, petitioner makes no reference in his briefing on this claim to other evidence linking him to the crimes.  Specifically, petitioner does not discuss the bloody palm prints which were found at the scene and which matched petitioner's prints.[27] Nor does petitioner mention the shoe tread print found at the scene which matched the tread on thongs he possessed.  Finally, it is undisputed that Mrs. Stendal was raped and that petitioner was in the Stendal residence on the night of the crimes.  Given these facts, and the foregoing evidence of petitioner's connection to the crime scene, a rational jury could infer that petitioner committed the rape.

It bears noting that petitioner's claim is based on the notion that innocent alternate explanations undercut the reasonableness of the jury's inferences.  Whether an explanation was believed is solely a question for the jury.  It is not for this court to second-guess the jury's determination to believe or not believe a particular explanation where, as here, the jury's ultimate determination is based on reasonable inferences supported by the evidence as a whole.  As respondents note, petitioner argued alternate explanations at trial and this court cannot re-weigh the evidence.  Petitioner recognizes this principle when he states in his opposition to respondents' motion for summary judgment that "while it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt."

/ / /

/ / /

---

[27]     Petitioner argues only that the prints can be innocently explained.

Because the state court's determination of this claim was not an unreasonable application of clearly established law under <u>Jackson</u>, respondents' motion for summary judgment on Claim N should be granted and petitioner's motion for summary judgment on this claim should be denied.  Claim N should be denied on the merits.

2.    <u>Felony Murder Based on Burglary (Claim J)</u>

As stated in the amended petition, petitioner narrows this claim to focus on whether "petitioner intended, before he entered the Stendal home, to commit the assumed rape, thereby committing a substantive burglary. . ."  Petitioner's logic is as follows:

> Unless . . . petitioner formed an intention to rape prior to entering the victim's home, there could be no reasonable finding of felonious intent and thus no substantive burglary, and no . . . first degree felony murder based on burglary.  Because there was not even a modicum of evidence to demonstrate felonious purpose, a significant portion of the guilt and enhancement structure on which the prosecutor relied crumbles.
>
> To establish that Stendal was killed in the course of petitioner's commission of a burglary, the prosecution was required to establish not only the admitted fact that [petitioner] was in her home on the night of April 21-22, 1982, but also that as he [entered the Stendal home] he intended to rape her.

Petitioner argues that "there was absolutely no evidence that he entered the house intending to rape [Mrs. Stendal]."

In their motion for summary judgment, respondents argue:

> . . . Claim J's assertion there was no evidence of felonious intent is flawed because it fails to recognize that intent is nearly always inferred, and there was ample evidence from which a rational trier of fact could infer Petitioner's felonious intent prior to his entry into Ms. Stendal's residence. Specifically, the cigarette butt suggested Petitioner stood outside the residence contemplating his next course of action and the methodical manner in which Petitioner isolated Ms. Stendal and subjected her to a prolonged rape, torture and finally murder was ample evidence of his intent.

In his opposition to respondents' motion for summary judgment, petitioner responds by arguing that any inference from these facts that he formed the intent to rape Mrs. Stendal before he entered her residence is based on "mere speculation."  Petitioner asserts that the inference of pre-

entry intent is not supported by a chain of logic, which is required for an inference to be

reasonable.

See Juan H. v. Allen, 408 F.3d 1262, 1277 (9th Cir. 2005).

As to this claim, the California Supreme Court stated:

> Defendant also urges there is insufficient evidence to support a finding of felony murder based upon the underlying felony of burglary because there is no evidence demonstrating he entered the residence with the requisite felonious intent, in this case the intent to commit rape.  Such intent usually must be inferred from all the facts and circumstances revealed by the evidence, because only rarely can it be revealed by the evidence, because only rarely can it be proved directly.  (citations omitted).  In view of (1) the previously described evidence of defendant's conduct in the hours preceding his entry of the Stendal residence, (2) the evidence he spent a period of time immediately outside the residence, presumably contemplating his next act, and (3) the methodical manner in which defendant isolated the victim and committed the rape, the nonsexual physical abuse, and finally the murder itself, it is clear that a rational trier of fact could conclude defendant had the requisite felonious intent prior to his entry into the residence.

Proctor, 4 Cal.4th at 533.

Because the California Supreme Court considered what inferences a rational jury could draw

from the evidence, it applied the correct clearly established law under Jackson.  Therefore, the

court must review under the "unreasonable application of" standard.

The central issue to Claim J is whether the cigarette butt evidence logically leads

to the inference that, prior to entering the Stendal residence, petitioner stood just outside

"contemplating his next act."  Petitioner argues:

> Respondent, and the state court, found the strongest evidence of pre-entry intent in the discovery of a cigarette butt outside Ms. Stendal's window.  For this evidence to support a finding of felonious intent, the jury would have had to built inference upon inference upon inference.  None of the necessary inferences were based on the evidence, but on speculation. This is not permissible under California law.  Inferences must be the probable outcome of logic applied to direct evidence; not mere speculative possibilities or conjecture based on other evidence.  (citations omitted; emphasis in original).
> For the jury to place any weight on the cigarette butt evidence, it would have had to infer that the cigarette butt came from an unfiltered cigarette.  From evidence suggesting Mr. Proctor had purchased a pack of Camel cigarettes, the jury was then required to infer that the discovered

cigarette butt was of the same brand smoked by Mr. Proctor.  From this inference, unsupported by any evidence whatsoever, the jury would have to infer that the cigarette butt had been left outside the window on the day of the crime.  Basing yet another inference on these preceding inferences, the jury would have to further infer that Mr. Proctor had left the cigarette butt there. . .  It would then have to infer that he left it there before entering Ms. Stendal's house on the day of the crime.  Finally, the jury would have to draw its determinative inference that while standing outside the victim's house smoking, Mr. Proctor "contemplated his next course of action," i.e., that he formed and intent to rape . . . Mr. Stendal.

Respondents do not address this argument other than by referring to the California Supreme Court's analysis.

The parties agree that the following facts relate to the cigarette butt:  (1) petitioner smoked unfiltered cigarettes; (2) Manley gave petitioner a pack of unfiltered cigarettes the day of the crime; and (3) a cigarette butt from an unfiltered cigarette was found outside Mrs. Stendal's window 11 days after the crime.  The ultimate inference, of course, is that petitioner formed the intent to rape Mrs. Stendal before entering her home.  To reach this ultimate inference, the jury would have had to make the following inferences based on the direct evidence:  (1) the cigarette butt found at the scene 11 days after the crime was from the same brand of cigarette smoked by petitioner; (2) petitioner smoked the particular cigarette before entering Mrs. Stendal's house while standing outside her window; (3) while smoking the cigarette, petitioner "contemplated his next move"; and (4) petitioner went beyond contemplation of a variety of possible next moves and actually formed the intent to enter the house in order to rape Mrs. Stendal.  The question under Jackson is whether these inferences are reasonable in light of the evidence viewed in the light most favorable to the prosecution.

In this light, the direct evidence concerning the cigarette butt reasonably leads to the inference that the cigarette butt found outside Mrs. Stendal's window 11 days after the crime was from a cigarette smoked by petitioner.  Petitioner smoked unfiltered cigarettes; Manley gave petitioner a pack of such cigarettes; and a butt from an unfiltered cigarette was found 11 days after the crime.  While certainly not the only conclusion to be drawn from this evidence, the

1 inference that petitioner had produced the particular cigarette butt found is within the realm of

2 reason and directly flows from the evidence.

3          Several of the other necessary inferences, however, do not flow directly from the

4 cigarette butt evidence.  For example, even though it is reasonable to infer that petitioner

5 produced the cigarette butt, the court is troubled by the next inference -- that petitioner smoked

6 the cigarette before entering the Stendal residence.  The record does not reflect any evidence

7 suggesting when petitioner smoked the cigarette in question.  Even more troubling are the next

8 required inferences -- that petitioner smoked the cigarette outside Mrs. Stendal's window while

9 thinking about what to do next and that, before entering, he ultimately decided to rape Mrs.

10 Stendal.

11          The California Supreme Court concluded that the direct evidence concerning the

12 cigarette butt, along with all the other evidence, supported these inferences.  As to the other

13 evidence, the state court noted petitioner's "conduct in the hours preceding his entry of the Stendal

14 residence" and the nature of the crimes.  See Proctor, 4 Cal.4th at 533.  In addition, petitioner had

15 abrasions on his legs consistent with sexual assault cases.  As discussed above, this court agrees

16 that the facts support the ultimate inference that petitioner raped Mrs. Stendal.  The same

17 evidence, however, does not say anything about when petitioner formed the intent to commit this

18 crime.

19          Though not specifically discussed by the state court in connection with this claim,

20 other evidence that petitioner "spent a period of time immediately outside the residence,

21 presumably contemplating his next act" could arguably be a hand print found on Mrs. Stendal's

22 window.  This evidence, however, does not reasonably support the inference for at least two

23 reasons.  First, there is no evidence linking the hand print to petitioner.  It could have been

24 anybody's.  Second, even if the hand print was petitioner's and even if it's presence on the window

25 suggested that petitioner peered into Mrs. Stendal's residence in contemplation prior to entering

26 her residence, it does not tend to show what petitioner may have contemplated or, if he

1 contemplated a felony, that he concluded that contemplation before entering the residence by

2 actually deciding to commit a felony.

3          Though both Claims J and N involve inferences from the evidence, the court

4 observes that Claim J differs from Claim N in at least one key respect.  In Claim N -- regarding

5 the inferences necessary to conclude that petitioner committed the rape -- the jury made

6 reasonable inferences based directly on the evidence to conclude that petitioner was the rapist.

7 For example, abrasions were found on petitioner's legs shortly after the crime.  In light of the

8 coroner's testimony that the abrasions were consistent with sexual assault cases, the jury could

9 directly infer that petitioner had committed a sexual assault, namely the rape which Mrs. Stendal

10 undeniably suffered.  Other evidence leading directly to the inference that petitioner committed

11 the rape was the knot evidence.  From this evidence, the jury could directly infer that petitioner

12 used the "trucker's hitch" knot to restrain Mrs. Stendal for the purpose of raping her.

13 Additionally, there was direct evidence in the form of the obscene phone calls and petitioner's

14 statements indicating a sexual intention.  In contrast, the ultimate inference at issue in Claim J --

15 concerning when petitioner formed the intent to rape Mrs. Stendal -- cannot be reached directly

16 from the evidence.

17          The court's concerns, however, do not warrant relief.  Even assuming that the

18 evidence does not permit the inference that petitioner formed the intent to commit rape prior to

19 entering the Stendal residence, the evidence is sufficient on at least one other factual basis of first

20 degree murder.  As discussed above, the court concludes that the evidence supports felony murder

21 based on rape, which is first degree murder.  A failure of proof on felony murder based on

22 burglary does not violate due process in this context.

23          Because the state court's determination of this claim was not an unreasonable

24 application of clearly established law under <u>Jackson</u> and <u>Griffin</u>, respondents' motion for

25 summary judgment on Claim J should be granted and petitioner's motion for summary judgment

26 on this claim should be denied.  Claim J should be denied on the merits.

3.    Torture Murder (Claims K, L, and M)

In Claims K, L, and M, petitioner challenges the sufficiency of the evidence of torture murder.[28]  In the remaining portion of Claim K, petitioner asserts that "there exists nothing beyond 'the condition of the body' to establish any intent on the killer's part to inflict tortious [sic] pain on Stendal -- let alone any evidence of revenge, extortion, or the like as a motive."  In Claim L, petitioner argues that the evidence does not support instructing the jury on torture murder pursuant to CALJIC No. 8.24 because the proof at trial did not establish that a specific act of torture caused the victim's death.  In Claim M, petitioner challenges the California Supreme Court's finding that California law does not require that a particular act of torture actually cause the victim's death.[29]  The parties have filed supplemental briefs addressing Claims K and L.

Claim M

The court turns first to Claim M, as to which both parties seek summary judgment in their favor.  Petitioner challenges the California Supreme Court's holding in his direct appeal that, under California law, the crime of torture murder does not require that a specific act of torture actually cause the victim's death.  He argues that the state court unconstitutionally enlarged the definition of the crime by eliminating this causal element.  Petitioner asserts that this was the first time the California Supreme Court interpreted the torture murder statute as not including this kind of causal requirement and that, with such a requirement, there would have been a failure of proof as to torture murder.[30]

/ / /

---

[28]    Claim K argues that:  (1) the evidence is not sufficient to support the conclusion that acts of torture caused Mrs. Stendal's death; and (2) the evidence is not sufficient to support the conclusion that petitioner intended to inflict extreme pain.  The causal connection portion of this claim has been dismissed.  The district judge declined to dismiss Claim L.

[29]    This conclusion as to the elements required to establish torture murder under California law was the basis for dismissal of the causal connection portion of Claim K.

[30]    Petitioner states that the prosecution admitted that the cause of death was strangulation, not torture.

Respondents assert in their motion for summary judgment that Claim M presents a pure question of law.[31]  Specifically, according to respondents, the question is whether the state court's holding was "unexpected and indefensible."  See Bouie v. City of Columbia, 378 U.S. 347, 354 (1964).[32]  Respondents argue that petitioner cannot make this showing because "the state court's explanation of torture-murder -- that acts of torture may not be segregated into their constituent elements in order to determine whether any single act by itself caused the death; rather, it is the continuation of sadistic violence that constitutes torture -- was logical, foreseeable, and evident from multiple precedents."

Generally, the California Supreme Court's interpretation of California law controls and cannot be re-interpreted by a federal court.  See Mullaney v. Wilbur, 421 U.S. 684, 691 (1975).  In certain cases, however, the retroactive application of an interpretation of state law which is "unexpected and indefensible" violates due process.  See Bouie, 378 U.S. at 354.  This is because an unforeseeable interpretation eliminates fair warning of what is prohibited.  See Marks v. United States, 430 U.S. 188, 191-92 (1977); see also Bouie, 378 U.S. at 351.  To determine whether a judicial construction of state law violates due process, courts consider the law's plain language, the legislative history behind the law, and other constructions of the law.  See Webster v. Woodford, 369 F.3d 1062, 1066-67 (9th Cir. 2004).

California Penal Code § 189 defines torture murder as murder "by means of torture."  See Proctor, 4 Cal.4th at 530; People v. Pensiger, 52 Cal.3d 1210, 1239 (1991); People v. Davenport, 41 Cal.3d 247, 267 (1985).  The phrase "by means of torture" means that "there must be a causal relationship between the torturous act and death. . . ."  Proctor, 4 Cal.4th at 530 (citing Pensiger, 52 Cal.3d at 1239).  This does not, however, mean that any specific act of torture must be the cause-in-fact of the victim's death.  See Proctor, 4 Cal.4th at 530).  "[R]ather, it is the

---

[31]      The court takes this to mean de novo review.  Given that the state court was not presented with the constitutional aspect of the claim, the court agrees that review is de novo.

[32]      Given his citation to Bouie, petitioner agrees.

1   continuum of sadistic violence that constitutes the torture."  Id.  In petitioner's case, the California

2   Supreme Court concluded that, while the actual cause of Mrs. Stendal's death was strangulation,

3   her death was "brought about by torture" and that this satisfied the causal connection requirement

4   of the torture murder statute.  Id. at 530-31.  Thus, the "causal" requirement of the torture murder

5   statute does not require that a specific act cause the victim's death, but requires that the torture be

6   part of the "totality of the brutal acts and the circumstances which led to the victim's death."  Id. at

7   530.  In other words, California Penal Code § 189 always required a causal connection between

8   the acts of torture and the victim's death, but not one as narrow as petitioner asserts.

9           Petitioner's argument relies on the premise that the California Supreme Court's

10  decision in his case resulted in a "reinterpretation" of the torture murder statute.  Specifically,

11  petitioner argues that the state court eliminated the requirement that a specific act of torture be the

12  cause-in-fact of the victim's death.  This is what petitioner refers to in his briefing as the "causal

13  requirement."  As discussed above, however, § 189 never required the narrow kind of cause-in-

14  fact asserted by petitioner.  Instead, the state courts have consistently interpreted the causation

15  element of § 189 -- stemming from the phrase "by means of torture" --  as referring to the

16  "continuum of sadistic violence" or "totality of the brutal acts."  Regardless of the terminology,

17  the court concludes that the state court's interpretation of § 189 has been consistent.  Therefore,

18  there has been no reinterpretation in petitioner's case.[33]

19          In their briefing on Claim M, the parties argue the significance of one California

20  Court of Appeal opinion in particular:  Talimantez v. Superior Court, 122 Cal.App.3d 629 (1981).

21  Petitioner argues that, because it interpreted the torture special circumstance statute, it has no

22  bearing on interpretation of the torture murder statute.  Given that the California Supreme Court

23  cited favorably to this opinion in petitioner's case, this court concludes that the state court adopted

24  _____

25          [33]     In his reply brief, petitioner cites Clark v. Brown, 442 F.3d 708 (9th Cir. 2006), in
        support of his argument.  In that case, unlike petitioner's case, the court concluded that there had
        been a reinterpretation of state law which was unforeseeable.  Because there has been no
26  reinterpretation of the torture murder statute, Clark does not apply here.

1  the reasoning from <u>Talimantez</u> in the torture murder context.   Moreover, <u>Talimantez</u> has bearing

2  because both the torture murder and torture special circumstance statutes contain similar

3  causation requirements.   Torture murder requires murder by means of torture.   <u>See</u> Cal. Penal

4  Code § 189.   The torture special circumstance requires murder involving infliction of torture.   <u>See</u>

5  Cal. Penal Code § 190.2(a)(18).

6          Because there has been no reinterpretation of the torture murder statute, Claim M

7  has no merit.   In this regard, the court agrees with respondents that the California Supreme

8  Court's decision in petitioner's case does not violate the <u>Bouie</u> test.   Respondents' motion for

9  summary judgment on this claim should be granted and petitioner's motion for summary judgment

10  on this claim should be denied.   Claim M should be denied on the merits.

11          <u>Claim L</u>

12          It is logical to consider Claim L next.   In Claim L, petitioner argues that the trial

13  court erred in instructing the jury under CALJIC No. 8.24 that torture murder requires causation

14  in fact because it was undisputed that strangulation -- not any act of torture -- was the cause of

15  death.   This claim necessarily fails because, as discussed above, the torture murder statute never

16  required that any particular act of torture actually cause the victim's death.   In any event, the

17  instruction referred to the torturous "act or acts" which cause the victim's death.   Thus, by

18  allowing for multiple acts of torture, the instruction reflects the interpretation that no specific one

19  act need be the actual cause of death.   In other words, the instruction correctly expressed the

20  causation requirement.

21          For these reasons, the court concludes that the state court's determination of Claim

22  L was neither contrary to nor an unreasonable application of the law.   Respondents' motion for

23  summary judgment on this claim should be granted.   Claim L should be denied on the merits.

24  / / /

25  / / /

26  / / /

1    Claim K

2    In the remaining portion of Claim K, petitioner asserts that the evidence does not

3 establish "that the killer intended to inflict extreme pain," a requirement for torture murder.[34]  A

4 close reading of the remainder of Claim K suggests that petitioner is  challenging the

5 requirements of extreme and prolonged pain and a prohibited motive in addition to intent.

6 Petitioner also argues that there was no evidence beyond the condition of the body, which is

7 insufficient to establish intent to torture.  As outlined in the amended petition, petitioner states:

8            Even if stab wounds constituted extremely painful acts that were
     inflicted on Stendal while she was living, that evidence, by itself, cannot
9    satisfy the equally necessary element of intent.  Under California law,
     "[M]urder by torture cannot be inferred solely from the condition of the
10   victim's body [citation], but other evidence of intent to cause suffering is
     also required [citations]." People v. Wiley, 18 Cal.3d 162, 168 (1976); see
11   also People v. Tubby, 34 Cal.2d 72, 77-78 (1949); People v. Walkey, 177
     Cal.App.3d 268, 276 (1986).  "The test cannot be whether the victim
12   merely suffered severe pain since presumably in most murders severe pain
     precedes death." Tubby, 34 Cal.2d at 77-78.

13

14 There is nothing in the amended petition concerning the requirements of extreme and prolonged

15 pain and a prohibited motive.  Because the argument offered in the amended petition focuses

16 exclusively on the intent element, the court concludes that Claim K does not raise a challenge to

17 any element of torture murder other than intent (the challenge regarding the causal element

18 having been dismissed).[35]   Respondents did not address Claim K in their answer, and neither

19

20      [34]     Under California law, torture murder requires proof of three elements:  (1) a
     willful, deliberate, and premeditated intent to inflict (2) extreme and prolonged pain (3) for the
21   purpose of revenge, extortion, persuasion, or for any other sadistic purpose.  See Pensiger, 52
     Cal.3d at 1239.  Thus, torture murder focuses on the intent of the defendant, the nature and
22   duration of the pain, and the reason it was inflicted.

23      [35]     The district judge's order regarding respondents' motion to dismiss is in accord.
     Specifically, the district judge stated:  "In Claim K, petitioner . . . asserts that two of the elements
24   of first-degree torture murder were not proven, namely, that (a) there was a causal link between
     the acts of torture and death, and (b) that petitioner intended to cause extreme pain."  The district
25   judge first stated that Claim K challenges two elements, and then referred to the "causal link"
     element and whether petitioner "intended to cause extreme pain."  Given the lack of argument in
26   the amended petition concerning extreme and prolonged pain, the two elements challenged in

party addressed the claim in their cross-motions for summary judgment.  At the court's request,

however, the parties filed supplemental briefing.

      The California Supreme Court addressed this claim in petitioner's direct appeal.

As to the injuries suffered by Mrs. Stendal, the state court noted:

> In the present case, the victim was subjected to strangulation by two
> different methods, her wrists were bound so tightly as to cut into her skin,
> she was beaten in the face severely enough to have caused her eyes to be
> swollen shut and her lips to be swollen, she received severe blows to other
> parts of her body, and she suffered repeated, incision-type wounds to her
> neck, chest, and breast area.  We conclude that this evidence amply
> supports the finding that Mrs. Stendal's death was brought about by torture.

Proctor, 4 Cal.4th at 531.

As to intent, the California Supreme Court held:

> In the present case, the coroner testified that many of the victim's wounds,
> particularly the knife "drag" marks, were inflicted while she still was alive
> but after she had been rendered incapable of avoiding further attack.  The
> wounds revealed that a relatively slow, methodical approach had been
> employed in their infliction, rather than their having resulted from sudden,
> explosive violence.  The nature of many of the wounds, including the
> repeated blows to the face and to other parts of the body, as well as the
> knife "drag" marks, suggests that they were administered over a substantial
> period of time and that defendant intended to inflict cruel pain and
> suffering on the victim.  Considered with the circumstances that the victim
> was isolated and prevented from resisting or escaping during these acts,
> this evidence establishes defendant's intent to torture the victim.

Id. at 531-32.

      Regarding the standard of review for this claim, the court observes that the

California Supreme Court's ultimate conclusion -- that there was sufficient evidence of

petitioner's intent to torture -- is not stated in terms of what a rational jury could find.  It follows,

however, that if the state court believed that the evidence was sufficient, it necessarily believed

that a rational jury could conclude that petitioner intended to torture the victim.  In light of the

state court's consistent application of the Jackson standard to petitioner's other claims of

---

Claim K are the required causal link and intent.

60

insufficient evidence, there is no reason to think that it did otherwise when considering this claim.[36]  Therefore, this court will review Claim K under the "unreasonable application of" standard.

In his supplemental brief on Claim K, petitioner argues that there was no evidence of intent to torture.  In support of this contention, he raises several points concerning the coroner's testimony, which was central to the state court's opinion.  Specifically, petitioner describes the substance of the coroner's testimony as follows:

1.  He testified that there was no evidence to establish the duration of the assault on the victim; the only opinion he offered on this point was that it was "probably not over a prolonged period of time. . . ." and that all of the acts could have been committed in as little as three to five minutes;

2.  The victim suffered no fractured bones, but only bruising and swelling;

3.  Even modest force to the face and eyes can cause prominent bruising;

4.  The kidney injury resulted from some kind of mild or moderate force, the cause of which could not be determined;

5.  The knife wounds were superficial, light, did not penetrate the skin, and were not inflicted with great force;

6.  One wound on the neck was made slowly;

7.  The coroner admitted there was no evidence to show whether the victim was conscious or unconscious during the infliction of the wounds; and

8.  The coroner opined that the victim was conscious at the time the wounds were inflicted  because the non-fatal wounds would make no sense if the victim "was totally unconscious and unable to perceive that injury."

In their supplemental brief on Claim K, respondents state that, under California law, the intent to inflict extreme pain may be inferred from:  (1) the circumstances of the crime; (2) the nature of the killing; and (3) the condition of the victim's body.  See People v. Morales, 48 Cal.3d 559 (1989).  According to respondents, evidence of premeditated and prolonged assault,

---

[36]   Once again, the court rejects petitioner's boilerplate argument that the "California Supreme Court did not address Mr. Proctor's constitutional arguments and thus they were not adjudicated by the state court."

1   numerous stab wounds, and rape support a finding of intent to inflict extreme and prolonged pain.

2   See id. at 560.  While respondents argue that the evidence shows that petitioner inflicted

3   "prolonged physical abuse," beyond conclusory references to the state court's analysis, they do

4   not discuss how the facts cited by the state court show he intended to do so.[37]

5              Notwithstanding petitioner's summary of the coroner's testimony, this court

6   concludes that the evidence reasonably supports the inference that petitioner intended to torture

7   Mrs. Stendal.  As discussed above, the evidence establishes that petitioner raped the victim.  Of

8   note is the following additional evidence:  (1) the victim was restrained; (2) a wound to the neck

9   was made slowly; (3) the victim suffered numerous non-fatal wounds; (4) according to the

10  coroner, the victim was conscious when these injuries were inflicted; and (5) the knife "drag"

11  wounds were superficial.  From these facts a rational jury could conclude that petitioner

12  restrained the victim in order to provide himself options provided by time and to deprive Mrs.

13  Stendal of options, particularly the option of escape.  A jury could also reasonably infer that the

14  extra time provided by restraining Mrs. Stendal allowed petitioner to make the slow neck wound.

15  Thus, it is reasonable to infer that petitioner restrained Mrs. Stendal in order to inflict wounds.

16  Additionally, the existence of non-fatal wounds suggests that petitioner's intent was not just to

17  rape (and later kill) the victim, but also to inflict injuries short of those which would cause death.

18             As to whether the victim was conscious when the various wounds were inflicted --

19  evidence which would support an inference that petitioner intended to torture the victim --

20  petitioner argues that the coroner's testimony cannot be accepted because he admitted that there

21  was no direct evidence on the issue.  The court disagrees.  Even though there was no direct

22  evidence, the coroner's logic is sound and reasonable when all the evidence is viewed in the light

23  most favorable to the prosecution.  Specifically, it is reasonable to say that the reason petitioner

24  inflicted non-fatal wounds (one of them slowly) was to cause apprehension and fear, which would

25

26       [37]     The cases contrast the intent to inflict extreme and prolonged pain with pain
     inflicted in an explosion of anger, which would not indicate the necessary intent.

1   have been impossible if Mrs. Stendal had not been conscious when they were inflicted.  The

2   desire to create apprehension and fear can also be inferred from evidence the victim was

3   restrained.

4         Finally, even if the evidence was insufficient to establish torture murder because of

5   a failure of proof of intent to torture, relief is not warranted because the evidence is sufficient on

6   an alternate factual basis of first degree murder.  Therefore, this court cannot say that the state

7   court's determination of the remaining portion of Claim K was an unreasonable application of the

8   law.  For this reason, respondents' motion for summary judgment on this claim should be granted.

9   To the extent it has not been dismissed, Claim K should be denied on the merits.

10        4.    Murder Based on Premeditation and Deliberation (Claim O)

11        Petitioner challenges the sufficiency of the evidence to establish premeditation and

12  deliberation.  Petitioner contends in the amended petition that the "Prosecution did not make more

13  than a token attempt at advancing this theory of guilt."  According to petitioner, facts which show

14  premeditation and deliberation fall into three categories:  (1) planning – facts about how and what

15  the defendant did prior to the killing which show that the defendant was engaged in activity

16  directed toward and intended to result in the killing; (2) motive – facts about the defendant's prior

17  relationship with the victim from which the jury could infer a motive to kill the victim and that

18  the killing resulted from reflection; and (3) manner – facts about the nature of the killing from

19  which the jury could infer that the manner of the killing was so particular and exacting that the

20  defendant must have planned to kill.  See People v. Anderson, 70 Cal.2d 15, 25, 26-27 (1968).[38]

21  Petitioner argues that the facts of his case do not fall into any of these categories.

22  _____

23        [38]     The California Supreme Court has outlined a "formula" for relief on a challenge
       to the sufficiency of the evidence to show premeditation and deliberation.  In Anderson, the
24     California Supreme Court noted:  "[T]his court sustains verdicts of first degree murder [based on
       premeditation and deliberation] typically when there is evidence of all three types and otherwise
25     requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1)
       or (3)."  Anderson, 70 Cal.2d at 26-27.  Premeditation and deliberation cannot be found solely
26     from the manner of the killing.  See id. at 27.

1    Claim O was addressed by the California Supreme Court in petitioner's direct

2  appeal.  The state court held:

> In order to ascertain whether the evidence is sufficient to sustain a finding of first degree murder based upon premeditation and deliberation, we generally examine whether there is evidence of planning, motive, or method, although these factors are not exclusive.  (citations omitted).  When the record discloses evidence in all three categories, the verdict generally will be sustained.  Otherwise, convictions for first degree murder typically have been upheld where there is "'either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' [Citations]."  (citations omitted).
>
> Our review of the record reveals evidence falling within all three categories.  With respect to planning, the evidence (the unfiltered cigarette butt found near a window and a hand print on the window sill) supports an inference defendant spent a period of time just outside Mrs. Stendal's residence observing her, before entering to commit the offenses.  Once inside, defendant rendered the victim subject to complete control by tying her hands and cutting the telephone lines.  After binding the victim, defendant had a significant period of time in which to contemplate and plan her eventual death as he engaged in various acts of torture.  (citations omitted).
>
> Although evidence of defendant's motive is less clear, a rational trier of fact could have determined that defendant's motive in murdering Mrs. Stendal was to avoid detection for the sexual and other physical abuses he had committed against her.  (citations omitted).
>
> Finally, the manner of killing supports a finding of premeditation.  The evidence establishes that defendant sequentially strangled the victim -- first manually, and then by means of ligature -- after subjecting her to prolonged physical abuse through the infliction of various types of wounds, some of which were not random.  During the infliction of these wounds, defendant could have quickly dispatched the victim by means of stabbing and beating, had he chosen to do so.  These circumstances do not suggest an unreflecting explosion of violence, but rather a preconceived design to kill the victim by the particular means chosen, and then to prolong her agony in the process.  (citations omitted).  Therefore, we conclude the evidence, although circumstantial, affords an adequate foundation for an inference of premeditation and deliberation by a rational trier of fact.
>
> _Proctor_,4 Cal.4th at 529-30.

24  By considering what a rational jury could conclude from the evidence, when viewed in the light

25  most favorable to the prosecution, the state court necessarily applied the <u>Jackson</u> standard.

26  Therefore, AEDPA precludes relief unless the state court's determination of this claim was an

1  unreasonable application of <u>Jackson</u>.

2          As a starting point, the court refers to the formula outlined by the California

3  Supreme Court in <u>Anderson</u>.  Typically, verdicts are upheld where the record reflects all three

4  categories of facts tending to show premeditation and deliberation -- planning, motive, and

5  manner.  <u>See</u> <u>Anderson</u>, 70 Cal.2d at 26-27.  If there is not a showing in all three categories, then

6  the verdict is upheld if there is an extremely strong showing of planning or a showing of motive

7  and either planning or manner.  Under this formulation, an inference of deliberation and

8  premeditation would be reasonable if any one of the following four expressions is true:

9          1.      Evidence  =  planning + motive + manner;

10          2.      Evidence  =  strong showing of planning;

11          3.      Evidence  =  motive + planning;

12          4.      Evidence  =  motive + manner.

13          With respect to manner and motive, petitioner asserts:

14                  . . . The cause of death was manual strangulation and/or
       strangulation with a scarf.  The scarf had been taken from the victim's
15       dresser.  Because the implements used were at hand, no inference of
       planning can be drawn from the manner of death.  Similarly, there was no
16       evidence Mr. Proctor had a motive to kill Ms. Stendal.

17  These arguments are not particularly persuasive.  Even though the "implements used were at

18  hand," that does not rule out the reasonable inference that, once inside the bedroom, and after

19  raping and torturing the victim, petitioner then formed the intention to kill her in order to

20  eliminate the sole witness to his crimes.  Planning does not require the passage of any specific

21  amount of time and can happen quickly.   Similarly, as to petitioner's contention that there was no

22  motive, it is reasonable to infer that the motive arose from the desire to escape apprehension.  So,

23  the evidence that he had a motive to kill Mrs. Stendal is the evidence that he raped and tortured

24  the victim.  This was the theory for premeditation and deliberation the prosecution argued to the

25  jury.

26  / / /

As to manner, respondents argue that this is the most pervasive evidence of premeditation and deliberation.  The essence of respondents' argument -- and the state court's analysis on this point -- is that, unless petitioner intended to inflict prolonged pain and suffering, he would have killed Mrs. Stendal quickly.  Respondents conclude, therefore, that the manner of Mrs. Stendal's death -- rape followed by acts of torture followed by strangulation -- demonstrates premeditation and deliberation.  This argument is more persuasive.  More specifically, the court concludes that a rational jury could infer that the manner of the entire series of crimes reflects prolonged violence and that this reflects premeditation and deliberation.

With respect to planning, it is reasonable to infer from the rape and other acts that petitioner planned to murder the victim in order to hide the other crimes.  Thus, there is evidence of all three categories of facts in this case -- planning, motive, and manner -- and, as a result, the inference of premeditation and deliberation is supported by the evidence.  And, even if there is no evidence of planning, for the reasons discussed above, the court concludes that the inference  is nonetheless supported by evidence in the categories of motive and manner.  Therefore, the evidence in this case was sufficient to support the inference of premeditation and deliberation.

Finally, as with all of petitioner's claims of insufficient evidence, Griffin applies to this claim because the conviction for first degree murder is supported by another factual basis, namely felony murder based on rape.  Either because the evidence supported the inference that petitioner committed first degree murder based on premeditation and deliberation, or because the first degree murder conviction is supported by another factual basis, the state court's determination of Claim O was not an unreasonable application of the law.  Therefore, respondents' motion for summary judgment on this claim should be granted and petitioner's motion on this claim should be denied.  Claim O should be denied on the merits.

/ / /

/ / /

/ / /

5.      Torture Special Circumstance Finding (Claim S)

In this claim, petitioner repeats the arguments raised in Claim K, discussed above, regarding the sufficiency of the evidence to establish torture murder.  In particular, petitioner contends that the evidence was insufficient for the jury to infer the necessary intent to torture.[39] As in Claim K, petitioner argues in this claim that there was nothing beyond the condition of the victim's body to establish that he had the intent to torture.  The California Supreme Court addressed this claim on direct appeal by stating:

> Defendant's claim that the evidence is insufficient to support the finding of a torture murder special circumstance must be rejected. . . .
>
> As discussed in detail above [in relation to petitioner's Claim K that the evidence does not establish the intent required for torture murder], there was ample evidence to support the jury's finding . . . that defendant intended to torture his victim. . . .

Proctor, 4 Cal.4th at 534-35.

Petitioner does not point to any reason why the analysis applicable to Claim K does not also apply to this claim, and the court finds no reason to apply a different approach.[40] Based on the court's conclusion with respect to Claim K, the state court's determination of Claim S was neither contrary to nor an unreasonable application of controlling law.  Therefore, respondents' motion for summary judgment on this claim should be granted and petitioner's motion for summary judgment on Claim S should be denied.  Claim S should be denied on the merits.

/ / /

/ / /

---

[39]      Petitioner begins this claim by noting that the torture special circumstance requires "proof the defendant intended to . . . torture the victim . . . and the infliction of extremely painful acts upon a living victim."  People v. Davenport, 52 Cal.3d 247, 271 (1985). By arguing only the intent element, petitioner concedes that the evidence establishes the requirement under the torture special circumstance statute of extremely painful acts.

[40]      The court notes that the intent elements of both torture murder and the torture special circumstance are essentially the same -- both require an intent to torture the victim.

6.      Cumulative Effect (Claim Q)

Claim Q is not a traditional cumulative error claim, but is based on petitioner's unsupported assertion that failure of proof on any of the factual bases of first degree murder requires reversal of the entire conviction.  Griffin, which petitioner concedes applies to these claims, forecloses this assertion.  Therefore, respondents' motion for summary judgment on this claim should be granted and petitioner's motion for summary judgment on Claim Q should be denied.  Claim Q should be denied on the merits.

**E.      Torture Special Circumstance Jury Instruction (Claim R)**

Petitioner claims that the trial court erred by instructing the jury on the torture special circumstance under California Penal Code § 190.2(a)(18).  Specifically, petitioner contends the instruction was flawed because it did not tell the jury that it must find that petitioner intended to inflict extreme pain before it could find petitioner eligible for the death penalty based on the torture special circumstance.[41]  The record reflects that the guilt phase jury was instructed pursuant to CALJIC No. 8.81.18 as follows:

> To find that the special circumstance referred to in these instructions is a murder involving infliction of torture is true, each of the following facts must be proved:
> One, that the murder was intentional and two, that the murder involved the infliction of torture.
> To prove the infliction of torture, the infliction of extreme and physical pain must be proved no matter how long its duration.

Petitioner also argues that this instructional error was not harmless because "[n]o other instructions were given from which an inference could be drawn that the jury necessarily found that Mr. Proctor had an intent to inflict extreme pain."

/ / /

/ / /

----

[41]      As respondents note in their answer, this claim is limited to the guilt phase jury's eligibility determination.  Petitioner does not argue that the torture instruction affected the penalty phase jury's selection decision.

1    A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a

2 transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083,

3 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available

4 for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see

5 also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378,

6 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  See Milton v.

7 Wainwright, 407 U.S. 371, 377 (1972).  Thus, a challenge to jury instructions does not generally

8 give rise to a federal constitutional claim.  See Middleton, 768 F.2d at 1085) (citing Engle v.

9 Isaac, 456 U.S. 107, 119 (1982)).

10    However, a "claim of error based upon a right not specifically guaranteed by the

11 Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

12 infects the entire trial that the resulting conviction violates the defendant's right to due process."

13 Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

14 Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a

15 claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete

16 miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396

17 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

18    In general, to warrant federal habeas relief, a challenged jury instruction "cannot

19 be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

20 process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

21 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner

22 must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

23 conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,

24 414 U.S. at 147).  In making its determination, this court must evaluate an allegedly ambiguous

25 jury instruction "'in the context of the overall charge to the jury as a component of the entire trial

26 process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

1   1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire

2   'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

3   way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494

4   U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an

5   instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  Where an instruction is missing a

6   necessary element completely, the "reasonable likelihood" standard does not apply and the court

7   may not ". . . assume that the jurors inferred the missing element from their general experience or

8   from other instructions. . . ."  See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994),

9   overruled on other grounds by Rohan ex rel. Gates v. Woodford, 334 F.3d 803, 815 (9th Cir.

10  2003).  In the case of an instruction which omits a necessary element, constitutional error has

11  occurred.  See id.

12          It is well-established that the burden is on the prosecution to prove each and every

13  element of the crime charged beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364

14  (1970).  Therefore, due process is violated by jury instructions which use mandatory

15  presumptions to relieve the prosecution's burden of proof on any element of the crime charged.

16  See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510

17  (1979).  A mandatory presumption is one that instructs the jury that it must infer the presumed

18  fact if certain predicate facts are proved.  See Francis, 471 U.S. at 314.  On the other hand, a

19  permissive presumption allows, but does not require, the trier of fact to infer an elemental fact

20  from proof of a basic fact.  See County Court of Ulster County v. Allen, 442 U.S. 140, 157

21  (1979).  The ultimate test of the constitutionality of any presumption remains constant – the

22  instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced

23  by the government, to find the ultimate facts beyond a reasonable doubt.  See id. at 156 (citing In

24  re Winship, 397 U.S. at 364).  Finally, even if constitutional error is found, habeas relief is not

25  warranted if the error was harmless.  See Ho v. Carey, 332 F.3d 587, 592 (9th Cir. 2003).

26  / / /

The California Supreme Court addressed this claim in petitioner's automatic direct appeal and held:

> Defendant contends the trial court erred in failing to instruct the jury that in order to find the special circumstance charged under section 190.2, subdivision (a)(18) (murder involving torture), to be true, it had to determine that defendant possessed the intent to torture Mrs. Stendal. (People v. Davenport, supra, 41 Cal.3d 247, 271). . . .
>
> Although [the] instruction did not specifically inform the jury that the concept "infliction of torture" included an "intent to torture," nothing in the instruction was inconsistent with that understanding of the concept. . . . [T]he present jury was instructed at the guilt phase both as to first degree torture murder and as to the torture-murder special circumstance. The first degree torture murder instruction specifically informed the jury that an "intent to cause cruel pain and suffering" . . . was a required element of the offense. As in [People v.] Wade, "nothing in the present record suggests the jury in this case was likely to have drawn any . . . distinction in the use of the term 'torture' in the two instructions." (44 Cal.3d at p. 994). Also, as in Wade, "neither the prosecutor nor defense counsel suggested at any point that a torture-murder special circumstance could be established without first proving an intent to torture." (Id. at p. 994-995). [¶] . . . In light of the various instructions and the entire trial record, we conclude there is no reasonable likelihood that the jury understood the torture-murder special circumstance instruction as not requiring a finding of intent to torture. (citations omitted).
>
> Proctor, 4 Cal.4th at 533-34.

Because the California Supreme Court considered whether the challenged instruction relieved the prosecution of its burden of establishing every element of the torture special circumstance beyond a reasonable doubt, this court finds that it considered petitioner's constitutional claim on the merits.[42] Therefore, AEDPA's standard of review applies to this claim.

In order to prevail on this claim, petitioner must demonstrate that: (1) the jury instruction relieved the government of its burden of establishing every element of the torture special circumstance beyond a reasonable doubt; and (2) the instruction had a substantial and injurious effect on the guilt phase verdict. In other words, petitioner must show constitutional

---

[42]   The court rejects petitioner's assertion that "[t]he California Supreme Court did not address Mr. Proctor's constitutional arguments and thus they were not adjudicated by the state court."

1   error which is not harmless.  If petitioner cannot make either of these two showings, the state

2   court necessarily reached the correct result in denying the claim and it cannot be said that the state

3   court's decision was contrary to or an unreasonable application of the law.  See Lockyer, 123

4   S.Ct. at 1175.

5          As to whether constitutional error occurred as a result of the challenged torture

6   special circumstance jury instruction, the California Supreme Court agreed with petitioner that the

7   instruction was incomplete under California law because it omitted the intent element.

8   See People v. Davenport, 41 Cal.3d 247, 271 (1985); People v. Leach, 41 Cal.3d 92, 109-10

9   (1985).  However, the California Supreme Court concluded that no error occurred because, in

10  light of the other jury instructions, the jury knew that intent to torture was a necessary element

11  under California Penal Code § 190.2(a)(18).  In particular, the court reasoned that the jury knew

12  of the intent requirement based on first degree torture-murder instruction, which included the

13  intent element.[43]

14         Petitioner argues in his opposition to respondents' motion for summary judgment

15  that the California Supreme Court applied the wrong legal standard in determining whether

16  constitutional error occurred.  Specifically, petitioner asserts that, rather than considering the

17  challenged instruction in light of the other instructions to determine if the jury was misled –

18  which is the correct standard for an ambiguous instruction – the correct law requires a finding of

19  constitutional error when a jury instruction is flawed on its face.  Petitioner cites Wade v.

20  Calderon, 29 F.3d at 1321 – a pre-AEDPA case – in support of this argument.  Based on this

21  / / /

22

23         [43]    The trial court instructed the jury on first degree torture-murder as follows:

24              . . . The essential elements of such a murder are one, the act or acts
            which caused the death must involve a high degree of probability of death
25          and two, the defendant must commit such act or acts with the intent to
            cause cruel pain and suffering for the purpose of revenge, extortion,
26          persuasion, or for any sadistic purpose.

1   argument, petitioner concludes that the "contrary to" standard of review should apply.[44]

2          The court agrees with petitioner in this regard.  In Wade, a capital case, the

3   petitioner was found death eligible based on two special circumstance findings – the crime was

4   "heinous, atrocious, or cruel," and torture under California Penal Code § 190.2(a)(18).  See Wade,

5   29 F.3d at 1316.  The California Supreme Court concluded that the "heinous, atrocious, or cruel"

6   special circumstance was unconstitutionally vague, but allowed the torture special circumstance

7   finding to stand.  See id.  As to the torture special circumstance, the state court concluded: "[W]e

8   believe that in the light of the accompanying torture-murder instruction . . . there is no reasonable

9   likelihood that the jury was misled on this issue."  See id. at 1320.  In concluding that

10   constitutional error had occurred as a result of the facially erroneous instruction, the Ninth Circuit

11   rejected this reasoning and also rejected the argument that the jury understood torture to include

12   an intent requirement based on the ordinary meaning of the word.  See id. at 1321.  Finally, the

13   Ninth Circuit concluded that the error was not harmless because, as the only remaining eligibility

14   determination, the jury's finding that Wade was eligible for the death penalty was necessarily

15   influenced by the error.  See id. at 1322.  Specifically, the court held: "Here, the effect of the error

16   was to permit the jury to find Wade eligible for the death penalty without having to make any

17   finding of his intent to torture."  The error thus influenced the jury's verdict.  See id.

18          Based on Wade, this court concludes that the California Supreme Court applied the

19   incorrect standard to petitioner's torture jury instruction claim.  However, regardless of whether

20   the "contrary to" standard applies as a result of the application of the wrong legal standard, or

21   whether the "unreasonable application of" standard applies as respondents urge, both standards

22   require this court to consider whether the constitutional error was harmless.  Here the similarity

23   between this case and Wade ends.  In Wade, the torture special circumstance finding was the only

24

---

25       [44]    It is interesting that petitioner asserts in the amended petition that the California
Supreme Court did not adjudicate this claim on the merits but then asserts in later briefing that
26   the state court did in fact adjudicate the claim, but under the wrong standard.

1  basis upon which Wade was eligible to receive the death penalty.  In contrast, petitioner was

2  found eligible on three alternate theories – torture, murder in the course of burglary, and murder

3  in the course of rape.  Petitioner does not challenge the jury instructions on either of the latter

4  special circumstances, and, as discussed above, the court concludes that sufficient evidence

5  supported those findings.  Accepting that the torture special circumstance cannot serve as a basis

6  for death eligibility given the omission of the intent element, it is still true that petitioner was

7  eligible for the death penalty based on either of the other two special circumstance findings.

8  Therefore, the result would have been the same – petitioner was death eligible.  Cf. id. at 1322-23

9  (granting the writ because the only other special circumstance finding had been invalidated as

10  unconstitutionally vague).

11       In concluding that any error with respect to the torture special circumstance

12  instruction was harmless, the court rejects petitioner's argument, as set forth in his opposition to

13  respondents' motion for summary judgment, that "[t]o prevail . . . respondent must demonstrate

14  that the erroneous special circumstance finding did not have a substantial injurious impact on the

15  jury's penalty verdict."  (emphasis in original).  While petitioner again cites to Wade in support of

16  this proposition, this is not a correct reading of Wade.  In that case, the Ninth Circuit specifically

17  considered whether the error had an impact on the jury's eligibility finding – not the actual

18  sentence determination.  See id. at 1322.  Moreover, a careful reading of Wade reveals that this

19  issue was discussed in the context of guilt phase claims.

20       Because the omission of the intent element from the torture special circumstance

21  jury instruction was harmless error, the court cannot say that the state court's determination of

22  this claim was either contrary to or an unreasonable application of clearly established law.

23  Respondents' motion for summary judgment on this claim should be granted and petitioner's

24  motion for summary judgment on this claim should be denied.  Claim R should be denied on the

25  merits.

26  / / /

F.      **Financial and Political Pressures in Shasta County (Claim P)**

In Claim P, petitioner asserts:

> Stephen Kennedy, a Shasta County public defender, was petitioner's trial counsel. Kennedy had a financial and an actual conflict of interest due to economic and political pressures applied by the Shasta County Board of Supervisors. This placed counsel in a position adverse to petitioner and caused him to make litigation decisions that were not in petitioner's best interest. A prejudicial conflict of interest existed between trial counsel's loyalty to petitioner, on the one hand, and his loyalty to the fiscal interests of Shasta County and of his employer, who had won his public defender's contract by promising to spend less money.

Petitioner states that the Shasta County Board of Supervisors fired the previous public defender – Russell Schwartz – because Mr. Schwartz had ". . .spent too much money defending another capital defendant, Darrell K. Rich, for investigators, experts, and retained second counsel."

Petitioner adds:

> Due to the economic conflict, Kennedy made numerous decisions regarding the preparation, investigation, and presentation of petitioner's defense that were adverse to petitioner's best interests. In this regard, Kennedy:
>
> a.      Failed to request sufficient funds for investigation;
>
> b.      Failed to request co-counsel
>
> c.      Failed to stipulate to a new guilt phase trial;
>
> d.      Failed to investigate petitioner's background and social history; and
>
> e.      Failed to incur necessary transportation and housing costs for, and present available witnesses in mitigation at petitioner's penalty phase trial in Sacramento.

This claim was raised as Claim I in petitioner's first state habeas petition. The California Supreme Court denied the claim on the merits without comment or citation.[45] Therefore, this court will assume the state court applied the correct law and will review the state court's decision

---

[45]      Again, petitioner is not correct in his amended petitioner when he states "[t]he California Supreme Court did not address Mr. Proctor's constitutional arguments and thus they were not adjudicated by the state court.

1   to determine if it was based on an objectively unreasonable application of that law.  See Himes,

2   336 F.3d at 853; Delgado, 233 F.3d at 982.

3          In the amended petition, while petitioner cites to Strickland v. Washington, 466

4   U.S. 668 (1984), in support of this claim, he asserts that relief is warranted if he can demonstrate

5   that an actual conflict existed which adversely affected counsel's performance.  Petitioner cites

6   Cuyler v. Sullivan, 446 U.S. 335 (1979), in support of this position.  Citing to Mickens v. Taylor,

7   535 U.S. 162 (2002), respondents argue that petitioner must also show actual prejudice under

8   Strickland.  In other words, respondents assert that petitioner must establish a reasonable

9   probability that, but for the deficient performance created by the conflict of interest, the outcome

10  of the trial would have been different.  See Strickland, 466 U.S. at 694.

11         In Cuyler v. Sullivan, the Supreme Court considered a claim based on an alleged

12  conflict of interest with counsel arising from counsel's representation in the same proceeding of

13  multiple defendants.  See 446 U.S. 335 (1979).  In Cuyler, the Court considered, among other

14  things, the following question: "[W]hether the mere possibility of a conflict of interest warrants

15  the conclusion that the defendant was deprived of his right to counsel."  Id. at 345.  The court

16  held that, to prevail on such a claim, the petitioner would have to show that ". . . an actual conflict

17  of interest adversely affected his lawyer's performance."  Id. at 348.  The Court noted that, at

18  least in cases involving a conflict arising from multiple representation, ". . . a defendant who

19  shows that a conflict of interest actually affected the adequacy of his representation need not

20  demonstrate prejudice in order to obtain relief."  Id. at 349-50.  In remanding for further

21  proceedings, the Supreme Court made its holding clear:

22         The Court of Appeals granted Sullivan relief because he had shown that the
            multiple representation in this case involved a possible conflict of interest.
23         We hold that the possibility of conflict is insufficient to impugn a criminal
            conviction.  In order to demonstrate a violation of his Sixth Amendment
24         rights, a defendant must establish that an actual conflict of interest
            adversely affected his lawyer's performance. . . . Since the Court of
25         Appeals did not weigh [the] conflicting contentions under the proper legal
            standard, its judgment is vacated and the case is remanded for further
26         proceedings consistent with this opinion.

1    Id. at 350.

2          In Bonin v. Calderon, the Ninth Circuit applied the Cuyler test to the petitioner's

3    claim that "[h]e was denied effective assistance of counsel . . . because his trial attorney suffered

4    from a conflict of interest."  59 F.3d 815, 823 (9th Cir. 1995).   The Ninth Circuit described the

5    alleged conflict as follows:

6          . . . Bonin asserts that he and [his trial attorney, William Charvet] had
           entered into a literary rights agreement before Charvet became his trial
7          attorney, and that the existence of the literary rights agreement gave
           Charvet an incentive, subsequent to his retention, to maximize publicity
8          about the case rather than to represent Bonin effectively.  Bonin also
           alleges that Charvet agreed to represent him . . . in return for an additional
9          ten percent of the literary rights proceeds, and argues that a conflict of
           interest existed because Charvet had to pay for investigative costs out of
10         his own pocket.  Bonin further asserts that Charvet refused to call a
           potential witness, Dr. Lunde, at the penalty phase . . . because he feared Dr.
11         Lunde would reveal the literary rights agreement. . . .  [¶] The State
           maintains that . . . any arrangement had been terminated before Charvet
12         began representing Bonin. . . .

13         Id. at 824.

14   The Ninth Circuit began its analysis from the starting point that "[t]he Sixth Amendment right to

15   counsel includes the right to counsel of undivided loyalty."  Id. (citing Wood v. Georgia, 450 U.S.

16   261, 272 (1981)).  Applying the Cuyler test, the court rejected Bonin's claims based on the

17   alleged

18   conflict because it concluded that no actual conflict existed.  See id. at 827.

19         In Rich v. Calderon, where, as here, the petitioner was represented at the trial level

20   by the Shasta County Public Defender's Office, the Ninth Circuit addressed the same argument

21   raised by petitioner in this case.  See 187 F.3d 1064, 1069 (9th Cir. 1999).  In rejecting the

22   petitioner's claim, the Ninth Circuit applied the Cuyler test and held:

23         Rich claims that his trial counsel labored under an "economic conflict" of
           interest because of pressures put on him by Shasta County funding
24         authorities.  The result of these pressures, Rich claims, was twofold: (1) his
           counsel was "chilled" from obtaining experts "untainted" by a confession
25         that was ultimately suppressed; and (2) an investigator was not hired to
           look into jailhouse conditions and their impact on Rich.

26

                                         77

1

2

3

4

> Even under the deferential standard the district court applied to this claim, it fails because Rich cannot show that: (1) his counsel actively represented conflicting interests; and (2) an actual conflict of interest adversely affected counsel's performance.  See [Bonin, 59 F.3d] at 825.  Rich's failure to make out such a prima facie case relieved the district court of any responsibility to hold an evidentiary hearing on the claims.  (citation omitted).

5

6

7

8

> A claim that a conflict produced adverse impact is not made out by simply claiming such; it must be an impact that significantly worsens the client's representation.  See United States v. Mett, 65 F.3d 1531, 1535-36 (9th Cir. 1995).  Rich's trial counsel provided an affidavit discussing the financial pressures he perceived at the time, which does not even suggest that he gave in to those pressures in any way that produced demonstrable harm of any kind to Rich's defense.

9

10

> The finding below that Rich was denied the effective assistance of counsel at trial is supported by substantial evidence.

11

> Rich, 187 F.3d at 1069.

12    In Mickens, the Supreme Court revisited the conflict issue and clarified its holding

13 from Cuyler.  The Supreme Court stated that the general rule requiring a showing of prejudice

14 consistent with the standard set forth in Strickland still applies in the conflict context and

15 identified Cuyler as an exception to this general rule applicable in cases of multiple

16 representation.  See 535 U.S. 162, 176 (2002).  The Court characterized the Strickland prejudice

17 requirement as an additional element for a conflict claim not involving multiple representation.

18 See id. at 174.  Therefore, under Cuyler, Bonin, and Rich, petitioner must demonstrate that an

19 actual conflict adversely affected counsel's performance.  Under Mickens, petitioner must also

20 demonstrate actual prejudice with respect to the outcome of the trial.

21    In moving for summary judgment, respondents argue that, as a matter of law,

22 petitioner is not entitled to relief on this claim.  In light of the standard of review under AEDPA,

23 respondents conclude that they must prevail because the state court's denial of this claim was not

24 an objectively unreasonable application of the law.  To reach this result, respondents apparently

25 argue that, even if an actual conflict existed, petitioner cannot establish prejudice under

26 ///

1   Strickland.  Specifically, in their answer to this claim, respondents argue:

2           In addition, Petitioner has failed to demonstrate that there is a
        reasonable probability the outcome of his trial would have been different if
3       counsel had taken some action that was not taken because of a financial
        conflict of interest.  In Rich v. Calderon, . . . the Ninth Circuit pointed out
4       there must be more than mere speculation that a financial conflict of
        interest affected the outcome; instead, there must be an adverse impact that
5       "significantly worsens" the client's representation.  Petitioner, however,
        cannot point to any solid evidence that his representation was significantly
6       worsened by alleged pressure to limit expenses.  Defense counsel did an
        admirable job in the face of "extremely strong" evidence of guilt that
7       included Petitioner's palm print in Ms. Stendal's blood at the scene of the
        murder.  Proctor, 4 Cal.4th at 537.  And the fact that Petitioner literally
8       tortured Ms. Stendal to death deflates any assertion that funding pressure
        significantly worsened Petitioner's chances during the penalty phase.

9

10  The first sentence of this paragraph clearly sets out the familiar Strickland prejudice standard.

11  The court, however, is puzzled by respondents' reliance on Rich in support of their assertion that

12  petitioner cannot establish prejudice under Strickland.   As discussed above, the Ninth Circuit in

13  Rich applied the Cuyler test, which did not have a Strickland prejudice component.  See Rich,

14  187 F.3d at 1069.  Therefore, the "adverse impact that 'significantly worsens' the client's

15  representation" refers to the requirements under Cuyler that there be an actual conflict and that

16  such conflict adversely impacts counsel's performance.  Therefore, Rich provides no authority on

17  the question of prejudice under Strickland.

18          As to the Cuyler requirements, respondents argue that petitioner cannot

19  demonstrate that a conflict existed which adversely affected Mr. Kennedy's performance.

20  Specifically, in their motion for summary judgment, respondents assert:

21          The record simply does not even remotely suggest that defense
        counsel had any personal financial stake in Petitioner's defense.  To the
22      contrary, the undisputed facts show that defense counsel hired a
        professional pollster to canvas the community and prepare a survey in
23      support of his motion for change of venue.  (8CT 209-11).  And defense
        counsel hired Dr. Bruce T. Kaldor to perform a psychiatric examination of
24      Petitioner.  (Doc. Y at 18-19, ¶ 42).  These actions by counsel persuasively
        refute Petitioner's speculation that his attorney labored under a debilitating
25      pressure to cut costs.  Moreover, our circuit has rejected a similar claim
        originating from Shasta County in Rich v. Calderon, 187 F.3d 1064, 1069
26      (9th Cir. 1999).

1   The facts cited by respondents, however, do not necessarily establish that Mr. Kennedy was not

2   operating under a conflict of interest.  For example, if these were the only things he did in

3   petitioner's defense, it still may be true that other things were not done because of fiscal

4   pressures, as petitioner claims.

5           Thus, the question remains – was the state court's denial of this claim without

6   comment or citation an objectively unreasonable application of clearly established Supreme Court

7   precedent?  Setting aside for the moment the question of prejudice under Strickland, the Ninth

8   Circuit in Rich was able to conclude that the petitioner could not make out a prima facie case

9   because ". . .trial counsel provided an affidavit discussing the financial pressures he perceived at

10  the time, which does not even suggest that he gave in to those pressures in any way that produced

11  demonstrable harm of any kind to Rich's defense."  Rich, 187 F.3d at 1069.  Similarly, in

12  Mickens, the district court had held an evidentiary hearing and the Supreme Court affirmed the

13  appellate court's conclusion that the petitioner had not demonstrated adverse impact.  See

14  Mickens, 535 U.S. at 165.  The parties in this case have not pointed to any declaration from Mr.

15  Kennedy similar to the one available in Rich.  Nor has this case advanced to the evidentiary

16  hearing stage.

17          Respondents essentially argue a failure of facts on necessary elements of

18  petitioner's conflict of interest claim.[46]  While it may be true nearer the end of this litigation that

19  petitioner will not be able to prove the facts necessary to warrant relief on this claim, the court

20  simply cannot make that determination at this point in the proceedings.  Based on clearly

21  established law, in order to resolve this claim, the court will need further evidence.  Of course,

22  this begs further procedural questions.  For example, if the state court was not presented with any

23  declaration from Mr. Kennedy when petitioner raised this claim in his second habeas petition,

24  ───────────────

25  [46]      Respondents argued earlier in this case that Claim P should be dismissed for
    failure to state a claim.  The court denied that motion, concluding that "[e]ven if the Cuyler
    presumed prejudice standard is now inapplicable to petitioner's case, he still has a cognizable
26  federal claim based upon the general standards set out in Strickland. . . ."

1    petitioner will need to make a specific showing before this court would be able to consider such a

2    declaration.  Similarly, petitioner must make a showing of entitlement to an evidentiary hearing.

3    These issues are not yet before the court.[47]

4         The court notes that, in presenting guilt phase claims for summary judgment,

5    respondents chose not to brief claims relating to assistance of counsel.[48]  Yet, respondents move

6    for summary judgment on Claim P, which requires an assessment of counsel's performance in

7    order to determine whether an actual conflict existed and, if so, whether it adversely impacted

8    petitioner's defense.  Such an assessment is also required to determine whether any actual conflict

9    resulted in prejudice under Strickland.   Put simply, the court finds that Claim P is more

10    appropriately considered with petitioner's other claims relating to performance of counsel.  In this

11    way, the court will be able to resolve all claims involving the Strickland standard at the same

12    time, and after any additional evidence is adduced, if appropriate.  Respondents' motion for

13    summary judgment on this claim, therefore, should be denied without prejudice.  If, after

14    resolving procedural issues and after conducting an evidentiary hearing, if petitioner is entitled to

15    one, petitioner is unable to prove essential elements of this claim, respondents' argument may be

16    more persuasive.

17

18                **IV.  CONCLUSION**

19         With the exception of Claim P (regarding financial and political pressures in

20    Shasta County), the court recommends denying all of the claims discussed in these findings and

21    recommendations on the merits.  Therefore, petitioner's motion for summary judgment should be

22    denied in its entirety.  Only respondents seek summary judgment as to Claim P.  The court herein

23    concludes that Claim P cannot be properly resolved at this time and, for this reason, recommends

24

25         [47]    For this reason, the court does not express any opinion at this time concerning these procedural issues.

26         [48]    Claims AA1, AA2, and AA3 assert guilt phase ineffective assistance of counsel.

1    that respondents' motion for summary judgment on this claim be denied without prejudice to

2    renewal at a later stage in the proceedings.[49]  As to all other claims addressed in respondents'

3    motion for summary judgment, the court recommends that the motion be granted.

4            Finally, the court recommends that petitioner's Rule 56(f) motion be denied.  The

5    basis for the motion, which is limited to Claim A, is that the "constitutional facts" underlying the

6    Supreme Court's holding in <u>Lockhart v. McCree</u> have since changed.  The holding in <u>Lockhart</u>,

7    however, was not premised on any particular set of facts (relevant here, studies which petitioner

8    contends show that "death qualification" leads to conviction-prone juries).  Rather, the Court

9    concluded that the death qualification process did not violate the constitution, even assuming

10    studies showing what petitioner asserts.  Therefore, there is no need for a continuance under Rule

11    56(f) to conduct further discovery on the "constitutional facts."

12            Based on the foregoing findings and conclusions, the court recommends that:

13            1.       Petitioner's Rule 56(f) motion (Docs. 185 and 186) be denied;

14            2.       Petitioner's motion for summary judgment (Doc. 189) be denied in its

15    entirety;

16            3.       Respondents' motion for summary judgment (Doc. 176) be granted in part

17    and denied in part without prejudice, as outlined herein; and

18            4.       Claims A, C, D, F, G, H, J, K (to the extent not already dismissed), L, M,

19    N, O, Q, R, and S should all be denied on the merits.

20    / / /

21    / / /

22    / / /

23    / / /

24    / / /

25

26       [49]       Claim P should be decided in conjunction with petitioner's claims of ineffective assistance of counsel, which are not currently before the court on the parties' cross-motions.

1   These findings and recommendations are submitted to the United States District

2   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 30 days

3   after being served with these findings and recommendations, any party may file written objections

4   with the court.  The document should be captioned "Objections to Magistrate Judge's Findings

5   and Recommendations."  Failure to file objections within the specified time may waive the right

6   to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

7

8   DATED:  May 14, 2007.

9

10                                    CRAIG M. KELLISON

11                                    UNITED STATES MAGISTRATE JUDGE